EBAY DOMESTIC HOLDINGS, INC., Plaintiff,

v.

Craig NEWMARK and James Buckmaster, Defendants,

and

craigslist, Inc., Nominal Defendant.

Civil Action No. 3705–CC.

Court of Chancery of Delaware.

Submitted: May 14, 2010.
Decided: Sept. 9, 2010.

2

William M. Lafferty, Eric S. Wilensky, Amy L. Simmerman, Pauletta J. Brown, and Ryan D. Stottmann, of Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware; of Counsel: Michael G. Rhodes, of Cooley Godward Kronish LLP, San Diego, California, Attorneys for Plaintiff.

Anne C. Foster, Catherine G. Dearlove, and Brock E. Czeschin, of Richards, Layton & Finger, P.A., Wilmington, Delaware, Attorneys for Defendants Craig Newmark and James Buckmaster.

Arthur L. Dent, Michael A. Pittenger, Berton W. Ashman, Jr., and Meghan M. Dougherty, of Potter Anderson & Corroon LLP, Wilmington, Delaware; of Counsel: H. Michael Clyde and K. McKay Worthington, of Perkins Coie Brown & Bain P.A., Phoenix, Arizona, Jason A. Yurasek and Joren S. Bass, of Perkins Coie LLP, San Francisco, California, Attorneys for Nominal Defendant craigslist, Inc.

### *OPINION*

CHANDLER, Chancellor

On June 29, 2007, eBay launched the online classifieds site www.Kijiji.com in the United States. eBay designed Kijiji to compete with www.craigslist.org, the most widely used online classifieds site in the United States, which is owned and operated by craigslist, Inc. ("craigslist" or "the Company"). At the time of Kijiji's launch, eBay owned 28.4% of craigslist and was one of only three craigslist stockholders. The other two stockholders were Craig Newmark ("Craig") and James Buckmaster ("Jim"),[1] who together own a majority of craigslist's shares and dominate the craigslist board. eBay purchased its stake in craigslist in August 2004 pursuant to the terms of a stockholders' agreement between Jim, Craig, craigslist, and eBay that expressly permits eBay to compete with craigslist in the online classifieds arena. Under the stockholders' agreement, when eBay chose to compete with craigslist by launching Kijiji, eBay lost certain contractual consent rights that gave eBay the right to approve or disapprove of a variety of corporate actions at craigslist. Another consequence of eBay's choice to compete with craigslist, however, was that the craigslist shares eBay owns were freed of the right of first refusal Jim and Craig had held over the shares, and the shares became freely transferable.

Notwithstanding eBay's express right to compete, Jim and Craig were not enthusiastic about eBay's foray into online classifieds. Accordingly, they asked eBay to sell its stake in craigslist, indicating a preference that eBay either sell its craigslist shares back to the Company or to a third party who would be compatible with Jim, Craig, and craigslist's unique corporate culture. When eBay refused to sell, Jim and Craig deliberated with outside counsel for six months about how to respond. Finally, on January 1, 2008, Jim and Craig, acting in their capacity as directors, responded by (1) adopting a rights plan that restricted eBay from purchasing additional craigslist shares and hampered eBay's ability to freely sell the craigslist shares it owned to third parties, (2) implementing a staggered board that made it impossible for eBay to unilaterally elect a director to the craigslist board, and (3) seeking to obtain a right of first refusal in craigslist's favor over the craigslist shares eBay owns by offering to issue one new share of craigslist stock in exchange for every five shares over which any craigslist stockholder granted a right of first refusal in craigslist's favor. As to the third measure, Jim and Craig accepted the right of first refus-

---

1. I use first names for convenience and ease of reference, and not out of disrespect.

al offer in their capacity as craigslist stockholders and received new shares; eBay, however, declined the offer, did not receive new shares, and had its ownership in craigslist diluted from 28.4% to 24.9%.

eBay filed this action challenging all three measures on April 22, 2008. eBay asserts that, in approving and implementing each measure, Jim and Craig, as directors and controlling stockholders, breached the fiduciary duties they owe to eBay as a minority stockholder of the corporation. After lengthy discovery and pre-trial motion practice, the Court held an extensive nine-day trial from December 7, 2009 to December 17, 2009. During trial, the parties examined nine live witnesses, offered seven witnesses by deposition, and presented over one thousand exhibits. The parties completed post-trial briefing on May 14, 2010. I conclude that Jim and Craig breached the fiduciary duties they owe to eBay by adopting the rights plan and by making the right of first refusal offer. I order rescission of these two measures. I also conclude that Jim and Craig did not breach the fiduciary duties they owe to eBay by implementing a staggered board. Accordingly, I leave that measure undisturbed, and craigslist may continue to operate with a staggered board.

## I. FACTS

Since the time the parties completed their post-trial briefing, I have examined carefully the briefs, exhibits, deposition testimony and trial transcript. I have also reflected at length on my observations of witness testimony during trial, including my impressions regarding the credibility and demeanor of each witness. The following are my findings of the relevant facts in this dispute, based on evidence introduced at trial and my post-trial review.[2]

### A. Oil and Water

In 1995, two individuals in northern California began to develop modest ideas that would take hold in cyberspace and grow to become household names. Craig Newmark, founder of craigslist, started an email list for San Francisco events that in time has morphed into the most-used classifieds site in the United States. Pierre Omidyar, founder of eBay, Inc., started an online auction system that has grown to become one of the largest auction and shopping websites in the United States. As they grew, both companies expanded overseas and established a presence in international markets.

Now, even though both companies enjoy household-name status, craigslist and eBay are, to put it mildly, different animals. Indeed, the two companies are a study in contrasts, with different business strategies, different cultures, and different perspectives on what it means to run a successful business. It is curious these two companies ever formed a business relationship. Each, however, felt it had something to offer to and gain from the other. Thus,

---

**2.** In telling this story, I discuss eBay's alleged misuse of craigslist's nonpublic information and some of eBay's allegedly unfair competitive activities. Whether eBay's use of craigslist's nonpublic information or its competitive activity was unlawful does not affect my decision in this case. Accordingly, I make no legal conclusion as to whether eBay is liable for unfair competition, misappropriation of trade secrets, trademark infringement, or the like, craigslist has filed suit against eBay in California asserting such claims, and I leave it to the California judiciary to resolve them. In this Opinion, I discuss eBay's use of craigslist's nonpublic information and eBay's competitive activities simply to tell the story of this dispute more completely.

despite all differences, eBay and craigslist formed a relationship.[3]

The dissimilarities between these two companies drive this dispute, so I will spend a moment discussing them. I will begin with craigslist. Though a for-profit concern, craigslist largely operates its business as a community service. Nearly all classified advertisements are placed on craigslist free of charge. Moreover, craigslist does not sell advertising space on its website to third parties. Nor does craigslist advertise or otherwise market its services, craigslist's revenue stream consists solely of fees for online job postings in certain cities and apartment listings in New York City.[4]

Despite ubiquitous name recognition, craigslist operates as a small business. It is headquartered in an old Victorian house in a residential San Francisco neighborhood. It employs approximately thirty-four employees. It is privately held and has never been owned by more than three stockholders at a time. It is not subject to the reporting requirements of federal securities laws, and its financial statements are not in the public domain. It keeps its internal business data, such as detailed site metrics, confidential.[5]

Almost since its inception, the craigslist website has maintained the same consistent look and simple functionality. Classified categories the site offers are broad (for example, antiques, personal ads, music gigs, and legal services), but craigslist has largely kept its focus on the classifieds business. It has not forayed into ventures beyond its core competency in classifieds, craigslist's management team—consisting principally of defendants Jim, CEO and President of craigslist, and Craig, Chairman and Secretary of the craigslist board—is committed to this community-service approach to doing business. They believe this approach is the heart of craigslist's business.[6] For most of its history, craigslist has not focused on "monetizing" its site. The relatively small amount of monetization craigslist has pursued (for select job postings and apartment listings) does not approach what many craigslist competitors would consider an optimal or even minimally acceptable level. Nevertheless, craigslist's unique business strategy continues to be successful, even if it does run counter to the strategies used by the titans of online commerce. Thus far, no competing site has been able to dislodge craigslist from its perch atop the pile of most-used online classifieds sites in the United States, craigslist's lead position is made more enigmatic by the fact that it maintains its dominant market position with small-scale physical and human capital. Perhaps the most mysterious thing about craigslist's continued success is the fact that craigslist does not expend any great effort seeking to maximize its profits or to monitor its competition or its market share.

---

**3.** It has often been said that politics makes strange bedfellows. Evidently, so can business.

**4.** Despite its undiversified revenue stream, the fees craigslist generates on job postings and apartment listings are substantial, apparently more than enough to meet craigslist's operating and capital needs and certainly enough to attract the attention of potential entrants into the online classifieds industry.

**5.** Summary site metrics are available on craigslist's website, but the more granular detail that would be useful for business planning purposes is not publicly available.

**6.** See, e.g., Tr. at 1572:23–1573:3(Jim) (testifying that craigslist's community service mission "is the basis upon which our business success rests. Without that mission, I don't think this company has the business success it has. It's an also-ran. I think it's a footnote.").

Now to eBay. Initially a venture with humble beginnings, eBay has grown to be a global enterprise. eBay is a for-profit concern that operates its business with an eye to maximizing revenues, profits, and market share. Sellers who use eBay's site pay eBay a commission on each sale. These commissions formed the initial revenue stream for eBay, and they continue to be an important source of revenue today. Over the years eBay has tapped other revenue sources, expanding its product and service offerings both internally and through acquisitions of online companies such as PayPal, Skype, Half.com, and Rent.com. eBay advertises its services and actively seeks to drive web traffic to its sites. It has a large management team and a formal management structure. It employs over 16,000 people at multiple locations around the world. It actively monitors its competitive market position. Its shares trade on the NASDAQ. It maintains a constant focus on monetization, turning online products and services into revenue streams. In terms of business objectives, eBay is vastly different from craigslist; eBay focuses on generating income from each of the products and services it offers rather than from only a small subset of services. It might be said that "eBay" is a moniker for monetization, and that "craigslist" is anything but.

## B. The Knowlton Crisis

Consistent with its ongoing interest in exploring new profit opportunities, eBay officially ventured into the online classifieds business in January 2004 when it acquired mobile.de, a leading classifieds site in Germany that specializes in selling automobiles. Concurrent with its purchase of mobile.de, eBay embarked on a detailed review of other classifieds opportunities around the world. Around the same time, craigslist was wading through an internal crisis with a stockholder named Phillip Knowlton that would ultimately lead eBay further into the classifieds arena by way of an investment in craigslist.

Knowlton was one of only three craigslist stockholders. He also sat on the craigslist board of directors. The other two stockholders at the time were Jim and Craig, who were also directors. In 2002, Knowlton began demanding that craigslist seek increased profits by monetizing more of its website. Jim and Craig resisted this idea for a considerable time. Eventually, Knowlton began to use his shares as leverage to effect change at craigslist. For example, in July 2003, Knowlton had his attorney send a letter to Jim and Craig outlining a number of "business alternatives" Knowlton might pursue if Jim and Craig did not follow his advice about monetization, including an alternative Knowlton characterized as "[n]on-[f]riendly-[p]ersuasion," which involved selling his minority interest to a competitor.[7] Jim, Craig, and craigslist's outside counsel viewed this as a threat to "convey the shares to parties that would have as [their] goal the destruction of [craigslist]."[8]

I will not take the time to elaborate on the back and forth that took place between Knowlton, Jim, and Craig during this dispute over monetization. Suffice it to say that by late 2003 Knowlton had begun actively shopping his shares. When that shopping began, Jim felt it was his duty as CEO to meet with potential suitors and share information about craigslist. When

---

7. PTX–8 (letter from Knowlton's counsel to craigslist's outside counsel (July 24, 2003)) at 60124–25.

8. Tr. at 1566:5–6(Jim); *accord id.* at 2228:12–17(Wes) (craigslist's outside counsel testifying that Knowlton's goal was to sell to a competitor who would "bleed [craigslist] and suck it dry.").

meeting with suitors, Jim typically required them to sign nondisclosure agreements that would protect craigslist's financial and other nonpublic information. Jim met with a number of suitors, including Google, Warburg Pincus, Yahoo!, and salon.com. The theme of the meetings was that Jim and Craig were not interested in selling their own shares but that they were both willing to accommodate a sale of Knowlton's shares.

In early 2004, eBay learned that Knowlton's shares were in play and quickly approached Knowlton expressing interest. After negotiations, eBay tentatively inked a deal to acquire Knowlton's shares for $15 million, signing a letter of intent to that effect on May 7, 2004. Wanting to "go through the front door" with its investment in craigslist, eBay also involved Jim and Craig in negotiations over its purchase of Knowlton's shares.[9] Thus, after the letter of intent was signed, threeway negotiations ensued, with all parties represented by counsel. During these negotiations eBay carried on a sort of shuttle diplomacy between Knowlton, on the one hand, and Jim and Craig, on the other, and also negotiated its own position.

eBay's hope at this juncture was that the "Knowlton Crisis" might provide an opportunity to acquire not only Knowlton's shares but also Jim and Craig's shares, thereby minting craigslist the newest member of the eBay family of companies. eBay executive Garrett Price was a principle negotiator for eBay. During negotiations, he "repeatedly and incessantly" explained that eBay was interested in acquiring a larger stake than Knowlton had to offer.[10] It soon became clear, however, that Jim and Craig were not interested in relinquishing any of their shares. eBay's push for a greater equity stake eventually resulted in Jim and Craig breaking off negotiations. When that happened, eBay asked craigslist representatives to meet with Meg Whitman, eBay's CEO. They did so on July 22, 2004. In that meeting Whitman assured Jim and Craig that eBay would be content with a minority interest in craigslist.

At an early stage of the negotiations, Jim and Craig learned that Knowlton was to receive $15 million for his shares. Upon receiving this revelation, Craig explained in an email to craigslist's outside counsel that he was "definitely not interested in seeing the dumb guy [Knowlton] get that figure."[11] As negotiations progressed, eBay came to believe that Jim and Craig wanted to be paid whatever Knowlton was paid before they would agree to the eBay investment.[12] As is common practice before making a minority investment in a closely held corporation, eBay was negotiating for certain rights to protect its investment. Brian Levey, eBay's in-house counsel, expressed in an email his understanding that Jim and Craig wanted to "receive some form of compensation for agreeing to [the] investor protections" eBay was negotiating for itself, "whether from [Knowlton's] proceeds on his stock sale to [eBay] or from [eBay] directly."[13] eBay believed that Jim and Craig viewed a straight payment to Knowlton for his shares as giving Knowlton "100% of the

9. *Id.* at 18:2–3 (Whitman).

10. *Id.* at 788:24–789:4 (Price).

11. PTX–19 (email from Craig to Jim and Ed Wes (May 25, 2004)).

12. PTX –49 (email from Garrett Price to eBay executives stating his belief that "anything we pay to [Knowlton] we also have to pay to Craig and Jim[.]" (July 29, 2004)).

13. PTX–24 (email from Brian Levey to eBay executives (June 1, 2004)).

financial benefits of any stock sale, while [Jim and Craig] are giving up important investor rights without corresponding compensation." [14]

### C. The eBay Investment

After three months of negotiations, eBay ultimately agreed to pay $32 million for Knowlton's shares. Knowlton received $16 million of that amount, and Jim and Craig each received $8 million.[15] eBay completed the purchase of Knowlton's shares on August 10, 2004. Since then, craigslist has been owned by Craig, Jim, and eBay. After eBay's investment, Craig owned 42.6% of craigslist, Jim owned 29% of craigslist, and eBay owned 28.4% of craigslist. The terms of eBay's investment in craigslist were set out in a stock purchase agreement (the "SPA") and a stockholders' agreement (the "Shareholders' Agreement"), both dated August 9, 2004. Jim and Craig also executed a voting agreement (the "Jim–Craig Voting Agreement") the same day. These agreements play a role in this dispute.[16] Accordingly, I will set forth the salient provisions of each, beginning with the SPA.

There are five parties to the SPA: eBay, Inc.; eBay Holdings, Inc.; 1010 Cole Street, Inc.; Jim; and Craig. eBay Holdings is a wholly owned subsidiary of eBay, Inc., formed for the specific purpose of acquiring and holding Knowlton's shares.[17]

eBay, Inc. and eBay Holdings are both Delaware corporations. 1010 Cole Street was a California corporation and the predecessor to craigslist, a Delaware corporation. Section 6.18 of the SPA required eBay to assist as needed in changing 1010 Cole Street's corporate domicile from California to Delaware, including approving a new charter for craigslist. A proviso of § 6.18 stated that the "reincorporation shall not result in a material change in [eBay's] rights as a shareholder of [craigslist]."

craigslist's new charter provided for a three-person board of directors to be elected under a cumulative voting regime. The mechanics of cumulative voting ensured that eBay could use its 28.4% stake in craigslist to unilaterally elect one of the three members to the craigslist board.

I will now explain the Shareholders' Agreement. The same five parties that signed the SPA signed the Shareholders' Agreement, which contains the lion's share of contractual provisions the parties focus on in this dispute. The Shareholders' Agreement sets forth (1) eBay's confidentiality obligations as a craigslist stockholder; (2) eBay's right to consent to certain Company transactions; (3) numerous transfer restrictions on the craigslist shares owned by Craig, Jim, and eBay; (4) eBay's right to compete with craigslist

14. *Id.*

15. The exact mechanics of eBay's investment are not relevant to the legal issues in these proceedings, so I will not burden the reader by spelling them out. In sum, eBay paid Knowlton $16 million directly for an option to purchase his shares (this option was exercised at the closing of eBay's investment) and eBay paid Jim and Craig $8 million each (which they received via a special craigslist dividend in conjunction with eBay's investment).

16. Contrary to what the reader might expect, however, this case does not involve claims for

breach of contract. Thus, the SPA, the Shareholders' Agreement, and the Jim–Craig Voting Agreement are not significant to a contractual dispute between Jim, Craig, and eBay. Rather, eBay uses these agreements to color its arguments that Jim and Craig breached their fiduciary duties.

17. Throughout this Opinion I refer to eBay, Inc. and eBay Holdings simply as "eBay" except in one or two instances where the separateness of the two entities has legal significance.

subject to certain consequences; and, most importantly, (5) the consequences (i.e., changes in the rights and obligations of the parties) that will ensue should eBay decide to compete with craigslist. Each of these provisions deserves a little unpacking.

Section 4.3 of the Shareholders' Agreement requires eBay to treat confidential craigslist information with the same degree of care eBay affords its own confidential information. Section 4.3 also limits how eBay may use craigslist's confidential information. Specifically, eBay Holdings (the shell entity that acquired craigslist's shares) is permitted to share confidential information with its subsidiaries, outside advisors, or eBay, Inc. "for the purpose of evaluating [eBay Holdings'] investment in [craigslist]."[18] Before sharing confidential information, eBay Holdings must obtain a written agreement from any subsidiary, advisor, or eBay, Inc., that they will abide by the confidentiality obligations in § 4.3.

Section 4.6(a) of the Shareholders' Agreement gives eBay the right to consent to certain transactions craigslist might enter into. The important consent rights provided eBay by § 4.6(a) include the right to consent to (1) any amendment to the craigslist charter "that adversely affects [eBay],"[19] (2) any increase or decrease in the authorized number of shares of craigslist stock,[20] (3) the adoption of any agreement between craigslist and its officers or directors providing for the issuance of stock,[21] and (4) declarations of dividends.[22]

Effectively, Section 4.6(a) gives eBay a veto over a host of possible transactions even though its minority interest would not otherwise have permitted eBay to prevent actions that required a stockholder vote (e.g., a proposed amendment to the craigslist charter) or to influence actions typically left to the discretion of the board (e.g., dividend declarations).

Section 2.1 of the Shareholders' Agreement requires eBay, Jim, and Craig to comply with certain transfer restrictions in the Shareholders' Agreement when transferring their craigslist shares. The transfer restrictions are found in § 5.1 (preemptive rights) and in §§ 6.2 and 7.2 (rights of first refusal) of the Shareholders' Agreement. The preemptive rights give eBay, Jim, and Craig the right to purchase enough shares in a new issuance of craigslist stock to maintain their respective ownership percentages. The rights of first refusal give eBay, Jim, and Craig first dibs on the purchase of each other's shares should any one of them wish to sell to a third party, provided they match the purchase price and other terms offered by the third party.

In negotiations, eBay strove to maintain full leeway to compete with craigslist in online classifieds even after acquiring a minority interest. eBay believed it was critical to preserve the right to compete, so much so that it likely would not have invested in craigslist without this right.[23]

---

18. PTX–73 (the "Shareholders' Agreement" (Aug. 9, 2004)) § 4.3.

19. *Id.* § 4.6(a)(iii).

20. *Id.* § 4.6(a)(i).

21. *Id.* § 4.6(a)(v).

22. *Id.* § 4.6(a)(vii).

23. For example, during negotiations, Price sent an email to eBay executives explaining

that Jim and Craig understood that if they insisted eBay sign a non-compete agreement it would be "a defcon 5/deal breaker issue" for eBay. PTX–30 (email from Garret Price to eBay executives (June 24, 2004)). I include this email in the story (1) to illustrate how strongly eBay felt about maintaining the right to compete and (2) because we all appreciate a good reference now and then to the Defense Readiness Condition ("DefCon") of the armed forces. A good DefCon reference, however, is *even better* when it makes use of the appropri-

Ultimately, eBay did not obtain an entirely unfettered ability to compete; the Shareholders' Agreement does expressly and unequivocally permit eBay to compete but guarantees certain consequences should eBay do so.[24] Interestingly, what craigslist considers "competition" is quite narrow. The Shareholders' Agreement defines "Competitive Activity" as "the business of providing an Internet posting board containing specific categories for the listing by employers and recruiters of available jobs and posting of resumes by job seekers anywhere in the United States."[25] Section 8.3(e) provides that if eBay launches an online job posting site in the United States, craigslist may issue a notice to eBay that eBay has engaged in Competitive Activity. If eBay fails to cure within ninety days, eBay loses (1) its consent rights, (2) its preemptive rights over the issuance of new shares, and (3) its rights of first refusal over Jim and Craig's shares. Concomitantly, however, eBay is freed of the rights of first refusal Jim and Craig hold over eBay's shares in craigslist, making those shares freely transferable. eBay's confidentiality obligations remain firmly in place. The Shareholders' Agreement states that the

change in rights and obligations specified by § 8.3 "shall be the sole remedy for any action brought by [craigslist] against [eBay] . . . that may arise from or as a result of [eBay] . . . engaging in Competitive Activity[.]"[26]

Finally, I discuss the Jim–Craig Voting Agreement. The Jim–Craig Voting Agreement is an agreement between Jim and Craig, in their capacities as stockholders, that spells out how Jim and Craig will vote their shares in director elections. Specifically, the Jim–Craig Voting Agreement requires Jim and Craig to vote their shares "so as to elect one [ ] representative designated by Jim . . . and one [ ] representative designated by Craig, as members of [craigslist's] Board of Directors[.]"[27] Given that craigslist was to have a three-director board after eBay's investment, the Jim–Craig Voting Agreement ensured that two out of the three director positions would be filled by Jim's and Craig's designees, who have always been Jim and Craig. The third position would be filled by eBay—not by contractual right, but by the laws of mathematics under a cumulative voting system with a non-staggered board.[28]

ate DefCon level. Accordingly, Price's DefCon reference would have been more adept if he had used DefCon 1, which signals "maximum force readiness." *See* Description of DefCon Defense Condition, Federation of American Scientists, http://www.fas.org/nuke/guide/usa/c3i/defcon.htm (last visited August 12, 2010); *see also* WARGAMES (Metro–Goldwyn–Mayer 1983) (Dr. McKittrick: "See that sign up here—up here. 'DefCon.' That indicates our current 'def'ense 'con'dition. It should read 'DefCon 5,' which means peace. It's still 4 because of that little stunt you pulled. Actually, if we hadn't caught it in time, it might have gone to DefCon 1. You know what that means, David?" David: "No. What does that mean?" Dr. McKittrick: "World War Three."). Price, however, referenced DefCon 5, which merely signals "normal peacetime readiness." I assume, there-

fore, that Price's reference to DefCon 5 is *not* an accurate characterization of what eBay's negotiation stance would have been had Jim and Craig fired a mandatory non-compete across eBay's bow.

24. Section 8.3 of the Shareholders' Agreement plainly states that eBay does not "have any obligation to refrain from engaging in Competitive Activity."

25. Shareholders' Agreement § 1.1(a).

26. *Id.* § 8.3.

27. PTX–74 (the "Jim–Craig Voting Agreement" (Aug. 9, 2004)) ¶ 2.

28. That is, eBay's 28.4% ownership stake was a sufficiently large enough interest to ensure

### D. eBay as a craigslist Stockholder

During the period leading up to eBay's investment, Omidyar met with Craig, founder-to-founder, regarding eBay's potential investment in craigslist. By that time, Omidyar had not been involved in the day-to-day management of eBay for many years, but he remained Chairman of the eBay board of directors. The meeting was largely a relationship-building endeavor. Omidyar came away with the impression that Craig was "a very, very bright guy," [29] even if one with "a rather unique user interface." [30] The rapport between Omidyar and Craig ultimately led eBay management to encourage Omidyar to fill the third seat on craigslist's board once eBay had made its investment. After thinking it over, Omidyar decided to join the board, viewing his role as "facilitating the relationship . . . between craigslist and eBay, help[ing] craigslist see the value of having eBay as a partner, and ultimately [getting] that relationship . . . closer and closer so that [eBay] would end up in an acquisition[.]" [31] Omidyar understood that the "long-term plan" was for eBay to acquire craigslist.[32] Not willing to place all their hopes in a single plan, however, eBay executives calculated that the eBay-craigslist relationship would at least provide them with an opportunity to learn the "secret sauce" of craigslist's success, presumably so that eBay could spread that sauce all over its own competing classifieds site.[33]

The first craigslist board meeting Omidyar attended was on February 1, 2005. By then, eBay had established its own footholds in the online classifieds arena internationally, independent of craigslist. For example, eBay had purchased mobile.de in Germany and Marktplaats in the Netherlands and was negotiating the acquisition of Gumtree in the United Kingdom. eBay was also in the latter stages of developing P168, a software platform it hoped would form the basis of all of its international classifieds sites. Price prepared a presentation for the February 1 craigslist board meeting that he forwarded to Jim, Craig, and Omidyar. The presentation outlined goals for the eBay-craigslist relationship. The first page of the presentation unabashedly proclaimed: "eBay has successfully followed a strategy of working extremely close with affiliates on their path to becoming wholly-owned subsidiaries of eBay, Inc." [34] The balance of the presentation contained information on the potential for an international eBay-craigslist partnership, including such lofty statements as "craigslist and eBay should act as members of one family to leverage their respective strengths and better serve their combined communities" [35] and "[i]t is critical to the craigslist-eBay relationship that eBay DNA becomes a part of craigslist and vice-versa." [36] A briefing memorandum given to Omidyar and Whitman [37] specified that eBay's goal was to make Jim and Craig

---

eBay would be able to unilaterally elect one of the three craigslist directors.

29. Tr. at 160:23 (Omidyar).

30. PTX-28 (email from Pierre Omidyar to Garrett Price (June 19, 2004)).

31. Tr. at 185:6–11 (Omidyar).

32. *Id.*

33. *See, e.g.,* DX-263 (email from Garrett Price to eBay executives (Oct. 25, 2004)).

34. DX-087 (presentation materials for the February 1, 2005 craigslist board meeting) at 8484.

35. *Id.* at 8485.

36. *Id.* at 8522.

37. Whitman attended a dinner with Jim and Craig after the board meeting but did not attend the board meeting itself.

understand that eBay felt a sense of urgency to capitalize on international classifieds opportunities and that craigslist and eBay needed to "get on the same page ASAP."[38] Perhaps because eBay recognized that its presentation would receive a cool response from Jim and Craig—particularly the part about craigslist becoming a wholly owned eBay subsidiary—the briefing memorandum cautioned Whitman to use discretion "regarding [any] attempt to obtain clarity on path to control."[39]

Omidyar's expectation going into the February 1, 2005 board meeting was that he would be treated as a potential partner, one who could impart wisdom from his own experiences with eBay to help craigslist improve its domestic business and sally forth (with eBay) into the new world of international classifieds. To that end, Omidyar came to the meeting offering to deploy eBay's resources to help craigslist improve trust and safety issues on the craigslist site and find new office space for craigslist, among other things. Omidyar also raised the possibility of an international eBay-craigslist partnership. Jim and Craig's responses to Omidyar's suggestions curbed whatever enthusiasm Omidyar had going into the meeting. Omidyar came away feeling that Jim and Craig "rebuffed" his suggestions and that the eBay-craigslist relationship was not as close as he had envisioned it would be.[40] All in all, the February 1 board meeting was not a blazing start to the eBay-craigslist relationship.

Perplexed at having been "treated more as an outsider than a potential partner," Omidyar looked to Price to determine "what the heck [was] going on."[41] Price then sent Jim an email ahead of the next craigslist board meeting scheduled for March 28, 2005, requesting that Jim and Craig provide a "relationship update" at the meeting. Price explained that Omidyar was interested in Jim and Craig's "motivations for taking the investment from eBay, what [they] expected to gain from it, and how [they] would like to see it work going forward."[42] At the March 28 meeting, Jim and Craig provided the board with a summary of their view of the eBay-craigslist relationship. Among Jim and Craig's expectations were the following: (1) eBay would show appreciation for craigslist's unique mission and philosophy, (2) eBay would be content with a minority equity stake and a three-year "getting to know you" period,[43] and (3) craigslist was to be eBay's primary interest in online classifieds.[44] After this second meeting, Omidyar felt that the expectations of eBay were severely disconnected from the expectations of Jim and Craig. He also believed his advice would not be well-received by Jim and Craig and, therefore, he eventually resigned as a craigslist director in November 2005.

The February 1 and March 28, 2005 craigslist board meetings reflect that the eBay-craigslist relationship was marred by inconsistent expectations from the beginning. eBay wanted to acquire craigslist,

38. PTX–162 (eBay's agenda items for the February 1, 2005 craigslist board meeting) at 30089.

39. Id.

40. Tr. at 201:6 (Omidyar).

41. Id. at 203:15 (Omidyar).

42. PTX–189 (email from Garrett Price to Jim and Craig (Mar. 21, 2005)).

43. After which, presumably, eBay might have the opportunity to acquire more craigslist shares or a larger ownership stake.

44. PTX–197 (presentation materials for the March 28, 2005 craigslist board meeting) at 45859.

and many eBay executives believed an acquisition was inevitable. Along the path to control, eBay hoped to combine the resources of the two companies to capitalize on international classifieds opportunities. During the first year of eBay's investment, eBay proposed at least three separate international joint ventures to craigslist, none of which materialized. eBay had also determined that if craigslist would not accompany it into the international classifieds arena, eBay was willing to delve into an international online classifieds business alone, hopefully using the "secret sauce" it learned from craigslist. Hence, even while eBay was proposing international partnerships to craigslist, eBay was independently building its own international portfolio of online classifieds sites.

Because Jim and Craig's expectations of the eBay-craigslist relationship diverged so sharply from eBay's, eBay's efforts to influence the direction of craigslist and to increase its craigslist holdings bore little fruit. Jim and Craig were typically slow to respond (or were entirely unresponsive) to eBay's suggestions. They did not implement most of eBay's ideas domestically and ultimately declined to partner with eBay on an international venture.

The stunted development of the eBay-craigslist relationship appears to have been driven in part by the oil-and-water nature of the two companies and in part by an antitrust investigation launched by the New York Attorney General's office (the "NYAG") shortly after eBay's investment in craigslist. As to the disparate nature of the two companies, eBay's goal was always to capitalize on the "tremendous untapped monetization potential"[45] of craigslist, but craigslist's goal was to grow its business by continuing along its (primarily) free-listings trajectory. Jim and Craig ultimately controlled the direction craigslist would take because they collectively owned the controlling block of craigslist shares and occupied two of the three board seats. eBay's ability to affirmatively influence craigslist was limited to the persuasion that might be achieved by the one director eBay was able to elect to the board.[46] By and large, Jim and Craig simply did not wish to go along with eBay's plans for craigslist, and they ignored most of eBay's overtures and suggestions.

The NYAG investigation also caused the eBay-craigslist relationship to stagnate. Apparently, the NYAG had antitrust concerns regarding § 8.3 of the Shareholders' Agreement, the provision dealing with eBay's right to compete with craigslist. During the investigation, eBay's outside counsel wrote a letter to the NYAG explaining that the Shareholders' Agreement was not an unlawful non-compete agreement implicating anti-trust concerns because it was not a non-compete agreement at all. The letter explained that if eBay engaged in Competitive Activity, "it [would] lose various shareholder rights, such as a board seat, approval of certain transactions, and right of first refusal on future stock issuances."[47] The letter further explained that the loss of these rights was not intended to dissuade eBay from competing but rather to protect craigslist's "competitively sensitive information and its business in the event eBay becomes a com-

---

45. *See* DX–202 (classifieds strategy presentation for the June 23, 2004 eBay board meeting) at 11911.

46. eBay also had the ability to block certain craigslist actions (e.g., issuance of new shares) through its consent rights and so could influence craigslist in that way.

47. DX–371 (letter from eBay's outside counsel to the NYAG (Apr. 27, 2005)).

petitor...."[48] Notwithstanding these reassurances, the NYAG continued its investigation and issued a subpoena to craigslist seeking company records. When craigslist received the subpoena, Jim and Craig decided not to pursue a partnership with eBay, fearing it would create additional antitrust fodder for the NYAG.

### E. Kijiji and craigslist's Nonpublic Information

While eBay was attempting to form an international venture with craigslist, it was also forging ahead in foreign territories on its own. eBay had already begun acquiring international classifieds sites. In March 2005, shortly after Omidyar's first attendance at a craigslist board meeting, eBay deployed P168 internationally, naming the site Kijiji. Although it is different in appearance than craigslist's site, Kijiji offered a similar free classifieds service with a broad selection of categories. Following Kijiji's unveiling, eBay expanded Kijiji to service countries throughout Europe and Asia and even launched a site in Canada.

After Omidyar resigned from the craigslist board, eBay appointed Joshua Silverman to replace him. Silverman had been responsible for leading the launch of eBay's European Classifieds Businesses, including Kijiji. He had hired the founding Kijiji teams and helped develop marketing plans and budgets for Kijiji.

Evidence introduced at trial suggests that the development of P168—as well as Kijiji, the site it spawned—was aided by nonpublic craigslist information that eBay had access to by virtue of eBay's minority investment and board seat. Evidence also suggests that, after launching Kijiji, eBay used craigslist's nonpublic information to expand Kijiji's reach and that eBay passed craigslist's nonpublic information around internally in a liberal fashion. For example, in October 2004, shortly after eBay purchased Knowlton's shares, Price asked Jim for access to nonpublic craigslist site metrics. This information was sent to eBay employee Erik Hansen, who had Price request it because he felt it would "be very helpful to plan our [i.e., P168's] capacity needs."[49] Around this time Silverman also used the craigslist due diligence data eBay had obtained before purchasing Knowlton's shares to take a "stab at initial projections and success metrics" for eBay's international classifieds business.[50] Silverman then shared those projections with Price. In June 2006, after Silverman became a craigslist director, he instructed eBay's accounting department to forward craigslist's nonpublic financial statements to Randy Ching, the eBay employee with global responsibility for Kijiji.[51] Ching continued to receive craigslist financials periodically until Jacob Aqraou succeeded him, at which point Ching forwarded craigslist financials to Aqraou, the eBay executive who would be responsible

48. *Id.*

49. DX–264 (email from Erik Hansen to Garrett Price (Oct. 19, 2004)); Tr. at 1052:13–19 (Price).

50. DX–076.01 (email from Josh Silverman to Garrett Price and eBay employee Adam Friedman with projections data attached (Nov. 9, 2004)).

51. DX–382 (email from eBay executive Alex Kazim to eBay employees announcing that Randy Ching had been assigned "global re-

sponsibility for Kijiji[.]" (June 28, 2005)); DX–102.02 (email from Josh Silverman to eBay accounting personnel instructing them to include Randy Ching on periodic distributions of craigslist financial statements (June 26, 2006)). Silverman received craigslist's financial statements because the Shareholders' Agreement required craigslist to forward its financial information to eBay on a monthly basis. Shareholders' Agreement § 4.1(d).

for Kijiji's launch in the United States. On March 12, 2007, Levey forwarded craigslist financials from 2004 to 2007 to Aqraou and his Kijiji launch team. Levey understood that this information would be used to determine whether it would be profitable to launch Kijiji in the United States.[52] Two days later, on March 14, 2007, Silverman and Levey attended a craigslist board meeting and received hard copies of craigslist's 2007 budget. After this meeting, Levey returned to his office and forwarded the budget information to eBay employee Pat Kolek saying, "Here are the numbers for [c]raigslist's 2007 financial plan. Look at all that cash! Please pass along to whomever on a need-to-know basis. Thx!"[53] In April 2007, eBay employee Martin Herbst used craigslist's 2007 budget in an "analysis on CL revenue" to determine "how much they make in AdSense in the cities that they charge listing fees ... [to] maybe giv[e] [eBay] a better sense of what Kijiji's potential could be if [it] got to similar penetration rates in [its] markets...."[54] Neither Jim nor Craig knew that craigslist's nonpublic site metrics or financial information had been forwarded to eBay employees working on P168 or Kijiji.

Apart from the use of nonpublic craigslist information, evidence introduced at trial also suggests that eBay employed a practice known as "scraping" to obtain data from craigslist's website. "Scraping" in the Internet context refers to the (typically automated) process of remotely extracting data from a third-party website. On several occasions before and after eBay purchased Knowlton's shares, eBay used a third-party service to scrape craigslist's site.[55] Jim and Craig were not aware this had occurred until they conducted discovery in this trial.

### F. The United States Launch of Kijiji and the Notice of Competitive Activity

On June 19, 2007, Silverman called Jim and informed him that eBay planned to launch Kijiji in the United States on June 29, 2007. Silverman worked from a script on the call. The script outlined numerous talking points Silverman wanted to get across to Jim. Included in these points was a reminder that the Shareholders' Agreement permitted eBay to launch a competing site domestically. The United States launch of Kijiji qualified as Competitive Activity under the Shareholders' Agreement because it provided a job list-

52. Tr. at 629:11–15 (Levey) ("Q. You took confidential craigslist information and you gave it to the people at eBay that were planning to launch Kijiji in the United States in the spring of 2007, didn't you? A. Yes."); *Id.* at 750:23–752:12 (Levey).

53. DX–474 (email from Brian Levey to Pat Kolek (Mar. 20, 2007)).

54. DX–476 (email from Martin Herbst to Lawrence Illg (Apr. 3, 2007)).

55. *See, e.g.,* DX–128 (email from eBay employee Rob Veres to vendor captioned "Up for more scraping?" and containing the following proposition: "If you're interested in doing more scraping, we're interested in getting a complete scrape of craigslist—I think you did only the "goods" categories before, but now

we'd want everything—all cities, all listings." (Apr. 30, 2004)); DX–620 (email from eBay employee Nancy Ramamurthi to a group of eBay executives regarding an upcoming meeting with Meg Whitman, explaining that Whitman "asks" for the next meeting to include a "[c]raigslist performance update: will have to rely on 3rd party sources and use, if possible, our scraping service." (May 2, 2006)); DX–130 (email from eBay employee Stephanie Ma to Martin Herbst: "Martin—I'm working on a project with the motors team and David Boyer suggested that you may have a scrape of Craigslist that shows the distribution of listings across categories and cities. If available, would you please send it over to us?" (July 10, 2007)).

ings section. Silverman's script did not contain an express acknowledgment that eBay could lose many of its rights under the Shareholders' Agreement by launching Kijiji in the United States. Silverman appears to have been aware of this possibility, however, because he told Jim that Levey would soon contact craigslist's outside counsel to discuss modifications to the Shareholders' Agreement in light of the United States launch of Kijiji.

Three days later, on June 22, 2007, Levey emailed a term sheet to craigslist's outside counsel proposing modifications to terms in the Shareholders' Agreement. Among other things, eBay sought to modify § 4.6 so that, although eBay would still lose its consent rights, craigslist would be required to give eBay "15 calendar days advance notice" before taking any § 4.6 actions, including an "adverse charter amendment" or "issuance of [craigslist] ... stock."[56] In exchange, Levey said eBay would be willing to consent to a charter amendment that would eliminate cumulative voting, thereby making it impossible for eBay to elect a director to the craigslist board. Levey believed eBay had a right to a board seat and that eBay would retain that right after launching Kijiji in the United States. No one at craigslist responded to Levey's invitation to renegotiate the Shareholders' Agreement.

On June 29, 2007, Kijiji went live in two-hundred and twenty cities in all fifty states. The same day, craigslist sent eBay a notice of Competitive Activity per § 8.3(e) of the Shareholders' Agreement. The notice gave eBay ninety days to cure before eBay would lose (1) its consent rights, (2) its preemptive rights over the issuance of new shares, and (3) its rights of

first refusal over Jim and Craig's shares. All was not dreary for eBay if it failed or declined to cure, however, because the craigslist shares eBay owned would become freely transferable. On July 6, 2007, Silverman resigned from the craigslist board, and Levey informed craigslist that eBay employee Tom Jeon would replace Silverman. Levey asked craigslist to send copies of the board resolutions appointing Jeon as a director. On the same day, craigslist's outside counsel asked Jeon for an introductory biography, which Jeon provided, but nobody communicated with Jeon thereafter. craigslist never seated Jeon; nor did it send confirmation to Levey that Jeon would be seated.

### G. "Our Thoughts"

On July 12, 2007, Jim sent an email to Whitman captioned "Our Thoughts," informing Whitman that craigslist wished to "gracefully unwind the relationship" between the two companies because craigslist was no longer comfortable with eBay's shareholding and board seat.[57] Jim explained that craigslist had received negative feedback from its users regarding the continuing eBay-craigslist relationship in the wake of Kijiji's launch. Jim further explained that craigslist did not think in terms of competition, but it was clear that eBay did, which made craigslist uncomfortable because eBay was a large stockholder privy to craigslist financials and other non-public information. Jim hoped craigslist could negotiate a repurchase of its shares from eBay or find a new home for the shares with some other investor.

After four days passed without a response from Whitman, craigslist's outside counsel—Ed Wes—telephoned Levey to

**56.** DX–488 (email from Brian Levey to Ed Wes attaching a term sheet of eBay's proposed changes to the Shareholders' Agreement (June 22, 2007)).

**57.** PTX–284 (email from Jim to Meg Whitman (July 12, 2007)).

see if Whitman had received Jim's email. After the discussion with Levey, Wes sent an email to Jim informing him of the conversation. According to the email, when Wes asked Levey how Whitman felt about Jim's proposal that eBay divest its shares, Levey responded with his own question: How would Jim and Craig react if Whitman told them to go "pound sand?" [58]

In the meantime, Jim had started to brainstorm with craigslist's outside counsel about what craigslist should do if eBay declined to sell its craigslist shares. The ideas batted around included issuing additional craigslist shares to a third party sufficient in number to dilute eBay's ownership to less than twenty-five percent, implementing a poison pill, and implementing a staggered board. In exploring these measures, Jim was trying to identify—with the help of counsel—capital structure or corporate governance changes that, if implemented, would make it impossible for eBay to place a director on the board and would limit eBay's ability to purchase additional craigslist shares. Of course, none of the proposed measures could be implemented before the ninety-day cure period had run, and eBay lost its consent rights. But presumably by then craigslist would know if eBay was going to keep its shares while operating a competing business.

Whitman finally responded to Jim's "Our Thoughts" email on July 23, 2007 with the following:

[W]e are so happy with our relationship with craigslist, that we could [not] imagine . . . parting with our shareholding in craigslist, Inc. under any foreseeable circumstances. Quite to the contrary, we would welcome the opportunity to acquire the remainder of craigslist, Inc. we

do not already own whenever you and Craig feel it would be appropriate.

. . . Given the foregoing long held and oft communicated sentiment, we are quite surprised that you would suggest any course of action to the contrary, especially given your recent comments to the Times:

"Many companies offer classifieds, but since we don't concern ourselves with considerations such as market share or revenue maximization, we don't think of them as competition."

"Our focus is providing what users want. If other companies are better positioned, then [users] should migrate over to that."

In keeping with the emphasis [eBay] places on integrity, we have already taken even further steps to completely firewall off the operations relating to our Kijiji offering in the U.S. from the corporate management of our investment in craigslist Inc. Hence, more than ever, we feel we should, as we have unfortunately been unable to do to date, together leverage the myriad assets in the global eBay Inc. family to provide the craigslist community with the best possible user experience.[59]

Jim and Craig interpreted this as Whitman's way of telling them to go "pound sand." They also began to suspect, based on Whitman's reference to an internal firewall, that nonpublic craigslist data had been used to develop and expand Kijiji. From that point, Jim and Craig were determined to take measures to keep eBay out of the craigslist boardroom and to limit eBay's ability to purchase additional craigslist shares.

---

58. PTX–286 (email from Ed Wes to Jim (July 16, 2007)).

59. DX–697 (email from Meg Whitman to Jim (July 23, 2007)).

### H. Jim and Craig Develop the 2008 Board Actions

For the next six months, Jim and Craig consulted with outside counsel on ways to accomplish their objectives. This process ultimately resulted in the execution of three transactions that gave rise to this dispute: (1) implementation of a staggered board through amendments to the craigslist charter and bylaws (the "Staggered Board Amendments"); (2) approval of a stockholder rights plan (the "Rights Plan"); and (3) an offer to issue one new share of craigslist stock in exchange for every five shares on which a craigslist stockholder granted a right of first refusal in favor of craigslist (the "ROFR/Dilutive Issuance") (collectively these three transactions are referred to as the "2008 Board Actions" or "Actions"). Before discussing the substance of the 2008 Board Actions, I will give a brief description of the process that Jim and Craig employed in developing and approving the Actions. I also will discuss incidents that increased the strain on the eBay-craigslist relationship during the period Jim and Craig crafted the Actions.

Development of the 2008 Board Actions spanned a period of six months. During that time, Jim and Craig met and conferred with counsel on a number of occasions. Counsel conducted legal research into the possibilities that Jim had begun to explore in July 2007. Counsel also introduced new ideas into the general framework. Jim and Craig considered yet ultimately rejected some of these ideas. Counsel also prepared and distributed to Jim and Craig at least four formal memoranda analyzing the legality of proposed aspects of the Actions. Jim and Craig reviewed the memoranda and asked questions. As Jim, Craig, and their counsel reached consensus on the substance of the Actions, counsel prepared drafts of the legal documents necessary to effectuate the Actions. Jim and Craig reviewed these drafts, asked questions, and suggested revisions before giving final approval. In short, the process for approving the 2008 Board Actions was deliberative, and both Jim and Craig were involved in it.[60] eBay was not involved in the process, and Jim and Craig took pains to ensure that eBay did not get wind of the 2008 Board Actions before their implementation.

As Jim and Craig mulled over the 2008 Board Actions, they received emails from concerned craigslist users who had run into what those users perceived to be a Kijiji subterfuge online. These users noted that when they typed "craigslist" or similar search terms into Google's search engine, their searches yielded Google AdWords results that contained links to what appeared to be craigslist.org or craigslist.com. Users who actually clicked on these links, however, were taken to Kijiji.com.[61] After confirming the accuracy of

---

60. At trial, eBay argued that Craig wholly abandoned his role as a craigslist director and was not involved whatsoever in the deliberations leading to adoption of the 2008 Board Actions. This is inaccurate. Jim clearly was more involved in the process than Craig, but there is sufficient evidence that Craig informed himself of the 2008 Board Actions before approving them. Accordingly, eBay's contention that Craig breached his duty of care is without merit.

61. See, e.g., DX–512 (writing to craigslist staff and noting the potential for monetary damages, a craigslist user explained the following: "I just searched Google about 1 minute ago and the top advertised link came in as: Sponsored Link Craigslist Com www.Kijiji.com 100% Free local classifieds site! Compare Kijiji & Craigslist. I clicked on it and it goes to Kijiji but I typed in [] my search on Google.com as: 'www.craigslist.com' You may want to have a word with someone. Best of luck, and 10% to me ..."); DX–514 (email from Terry Richards, administrator of the

these reports, Jim sent Whitman an email demanding that the ads be removed. No one ever responded to Jim.[62]

After the Google AdWords incident, Jim and Craig forged ahead with crafting the 2008 Board Actions. Wes informed Jim that there was a possibility eBay would file suit once Jim and Craig implemented the Actions. On October 31, 2007, Jim made notes to himself about the implications of an eBay-versus-craigslist suit, observing that it would set up a "david-vs-goliath battle which could be good PR." [63] Thus, Jim contemplated that the 2008 Board Actions could lead to a legal battle with eBay that would attract attention and speculated that such a battle, undesirable as it might be, could nevertheless cast craigslist in a positive light.

By the end of December 2007, Jim and Craig had reached a final decision on the particulars of the 2008 Board Actions. Jim, Craig, and their counsel designed a sequence for approving and implementing the Actions at the beginning of 2008, planning to notify eBay after the Actions were a *fait accompli*. In accordance with this plan, on January 1, 2008, Jim and Craig executed a unanimous written consent as craigslist directors and a written consent as majority stockholders to approve the Actions. On January 2, they implemented the Actions. On January 3, they informed eBay.

### I. The Practical Effect of the 2008 Board Actions

Jim and Craig implemented three separate Actions on January 2:(1) the Staggered Board Amendments, (2) the Rights Plan, and (3) the ROFR/Dilutive Issuance. I will explore the substance of each Action to illustrate the effect the 2008 Board Actions had on eBay as a minority stockholder and to illustrate how the Actions altered the eBay-craigslist relationship. I begin with the Staggered Board Amendments.

### 1. The Staggered Board Amendments

On January 2, 2008, Jim and Craig restated the craigslist charter and bylaws in their entirety. For present purposes, the important changes in these documents were the addition of provisions implementing a staggered board.[64] The Staggered Board Amendments created three classes of directors, one director per class, with each class serving three-year terms. Each year one director is up for election. The restated charter appointed Craig as the Class I director and Jim as the Class II director, and left Class III open, to be filled at a later date. Craig was to serve until the 2008 stockholders' meeting, and

---

Fredericksburg, Virginia local online classifieds site *BurgBoard.com*, to Craig captioned "Kijiji or whatever the hell its [sic] called" stating: "Craig, How goes it? I was browsing some classified sites in VA and noticed this adsense ad that Kijijiji [sic] (WTF) is running . . . I think it is unethical and unfair to your business to run ads with your brand in it." (Oct. 11, 2007)). Richard's spelling of Kijiji with an extra "ji" was obviously intentional.

**62.** Whitman forwarded Jim's email to Aqraou's Kijiji team asking that a response be issued. There is no evidence a response was made, but employees with the Kijiji team noted that eBay could "turn off the U.S. paid

stuff easily." DX–516 (email from Lawrence Illg to Jacob Aqraou (Oct. 11, 2007)).

**63.** PTX–320 (Jim's personal notes regarding the poison pill and rights of first refusal measures the craigslist board was considering (Oct. 31, 2007)).

**64.** Article VIII of the restated charter and Article 3.3 of the restated bylaws implemented a staggered board. PTX–361 (Second Amended and Restated Certificate of Incorporation of craigslist, Inc. (Jan. 2, 2008)) ("Restated Charter"); PTX–360 (Amended and Restated Bylaws of craigslist, Inc. (Jan. 2, 2008)).

Jim was to serve until the 2009 stockholders' meeting. Whoever was appointed to the Class III director position would serve until the 2010 stockholders' meeting.[65] To date, the Class III director position has not been filled.

The Staggered Board Amendments did not eliminate cumulative voting. Article IX of the restated charter specifically provides for cumulative voting. Practically speaking, however, the cumulative voting provisions are not meaningful if only one director position is up for election in any given year. There must be at least two board seats in play in order for a stockholder to cumulate votes and direct those votes towards a single director candidate. Because eBay's ability to unilaterally elect a director depended on a cumulative voting regime where all three positions were up for grabs in a given year, the staggered board cut off eBay's unilateral ability to place a director on the craigslist board.

### 2. *The Rights Plan*

The Rights Plan implemented on January 2, 2008 contains some standard terms frequently seen in rights plans and some not-so-standard terms. The Rights Plan pays a dividend to craigslist stockholders of one right per share of craigslist stock. Each right allows its holder to purchase two shares of craigslist stock at $0.00005 per share if the rights are triggered. There are two triggers. The first trigger involves acquisitions by Jim, Craig, or eBay. If any of these three becomes the "Beneficial Owner" of 0.01% of additional craigslist stock, the rights are triggered. The second trigger involves anyone other than Jim, Craig, or eBay. Should any such person become the "Beneficial Owner" of 15% or more of craigslist's outstanding shares, the rights are triggered. "Beneficial Ownership" is defined broadly. Specifically, a stockholder is deemed to "beneficially own" not only the shares he or she actually owns, but also shares owned by the stockholder's affiliates, associates, or persons with whom the stockholder has "any agreement, arrangement or understanding (whether or not in writing), for the purpose of acquiring, holding, voting . . . or disposing of any voting securities of [craigslist] . . . ."[66]

Certain transfers do not trigger the rights. Specifically, the rights are not triggered if Jim or Craig transfers shares to his heirs by will or intestate succession, to a trust established for estate planning purposes, or to a charitable organization. eBay Holdings may transfer its shares to eBay, Inc. or to any successor in interest by merger (provided the successor remains a wholly owned direct or indirect subsidiary of eBay, Inc.) without triggering the rights.

The Rights Plan gives the craigslist board four options if the rights are triggered: (1) the board can redeem the rights at $0.00001 per right within ten days, and the rights will not become exercisable; (2) the board may amend the Rights Plan within ten days to make the Rights Plan

65. Given that it is 2010 and both Jim and Craig remain on the craigslist board, it is safe to assume they reelected themselves in 2008 and 2009 in their capacity as stockholders, though no evidence was presented on this point. Presumably, each voted for the other as required by the Jim–Craig Voting Agreement.

66. PTX–362 (Statement of Rights (Jan. 2, 2008)) § 1(d)(iii). The parties dispute whether the Rights Plan would treat eBay as the "Beneficial Owner" of Jim or Craig's shares in the event either Jim or Craig gave eBay a revocable proxy to vote their shares. eBay argues that it would be treated as a "Beneficial Owner" of Jim or Craig's shares in such a case and therefore cannot engage in a proxy contest without triggering the rights. Jim and Craig, however, argue that the Rights Plan permits revocable proxies. As I will describe below, I need not settle this dispute.

inapplicable to the transaction that triggered the rights; (3) the board may leave the choice of whether to exercise the rights in the hands of the individual stockholders; or (4) within ten days of the rights being triggered, the board may unilaterally exchange the rights for shares of stock, at a rate of two shares of common stock per right.

### 3. *The ROFR/Dilutive Issuance*

Under the ROFR/Dilutive Issuance, Jim, Craig, and craigslist executed a right of first refusal agreement that provided that Jim and Craig would receive one newly issued craigslist share for every five shares over which they granted a right of first refusal in craigslist's favor. By signing the right of first refusal agreement, Jim and Craig gave craigslist a right of first refusal over their shares in the event a third party wished to purchase their shares. Jim and Craig approved the right of first refusal agreement in their capacity as directors, and Jim signed the agreement on craigslist's behalf in his capacity as CEO. Jim and Craig then signed the right of first refusal agreement in their personal capacities as stockholders. The right of first refusal agreement gives eBay three years to execute a joinder to the right of first refusal agreement.[67] If eBay does this, eBay will receive the same deal as Jim and Craig, namely a newly issued craigslist share for every five shares eBay encumbers with a right of first refusal in craigslist's favor.

Under the right of first refusal agreement, if craigslist receives the opportunity to exercise its right of first refusal and decides not to, the third-party purchaser of the shares, as a condition of the sale, must execute a joinder agreement leaving craigslist's right of first refusal in place.[68] Thus, craigslist has a perpetual right of first refusal over Jim and Craig's shares, a right that will only be extinguished if craigslist purchases the shares. The right survives even if Jim or Craig transfers his shares to a third party that outbids craigslist. Should eBay decide to grant craigslist a right of first refusal, craigslist would have the same perpetual rights over eBay's craigslist shares as it does over Jim's and Craig's shares.

Certain share transfers are exempt from craigslist's right of first refusal. Specifically, transfers by Jim or Craig to their heirs by will or intestate succession, to a trust established for estate planning purposes, or to a charitable organization do not invoke craigslist's right of first refusal. Such transferees of Jim or Craig, however, must execute a joinder leaving craigslist's right of first refusal intact. Transfers by eBay Holdings to eBay, Inc. or to any successor in interest by merger (provided the successor remains a wholly owned direct or indirect subsidiary of eBay, Inc.) do not invoke craigslist's right of first refusal. Such transferees of eBay also must execute a joinder.

Importantly, when the right of first refusal agreement was executed, eBay's shares were freely transferable. Jim and Craig's shares, on the other hand, already were encumbered by the right of first refusal each held over the other's shares under § 7.2 of the Shareholders' Agreement. Thus, in granting craigslist a right of first refusal, Jim and Craig were placing an encumbrance on shares that were already encumbered. If eBay were to grant a right of first refusal, however, it would be encumbering freely tradeable shares.

---

67. Under the right of first refusal agreement, craigslist may accelerate this timetable by issuing a notice to eBay, at any time, that eBay has thirty days to execute the joinder before eBay's opportunity to become a party to the agreement will terminate. PTX–359 (Right of First Refusal Agreement (Jan. 2, 2008)) § 1.1.

68. *Id.* § 3.2(b).

Because eBay chose not to grant a right of first refusal in craigslist's favor, eBay did not receive additional craigslist shares. The effect of the ROFR/Dilutive Issuance was to dilute eBay's ownership in craigslist from 28.4% to 24.9%. Concomitantly, Jim's ownership increased from 29% to 30.4%, and Craig's ownership increased from 42.6% to 44.7%. I will discuss the economic effects of this dilution in my analysis of the legitimacy of the ROFR/Dilutive Issuance below.

The ROFR/Dilutive Issuance was another nail in the coffin of eBay's ability unilaterally to elect a director to the craigslist board. Under a cumulative voting regime with no staggered board and three board seats up for election, the laws of mathematics require a minority stockholder to own at least 25% of the company for the minority stockholder's cumulated votes to be sufficient to elect one of the three directors. The ROFR/Dilutive Issuance diluted eBay to 24.9%, which made it impossible for eBay to unilaterally elect a director even if Jim and Craig had not approved the Staggered Board Amendments to implement a staggered board. Evidence introduced at trial suggests that Jim and Craig chose the five-to-one ratio to ensure that, if eBay did not grant a right of first refusal, it would be diluted to an ownership percentage just below 25%.

*J. "David" and "Goliath" in the Courtroom*

When David first confronted Goliath, the giant was chagrined.[69] Similarly, perhaps,

eBay was chagrined when craigslist confronted it with the 2008 Board Actions on January 3, 2008. eBay responded by filing suit against craigslist on April 22, 2008, alleging that the Actions were a breach of fiduciary duty by Jim and Craig in their capacities as directors and as controlling stockholders. eBay also alleged that the ROFR/Dilutive Issuance violates 8 *Del. C.* §§ 152 and 202(b). craigslist responded by filing suit against eBay in California state court on May 13, 2008, alleging that eBay engaged in unfair competition, misappropriation of trade secrets, false advertising, trademark infringement, and other wrongs. In the California action, craigslist seeks, among other things, to have eBay restore the craigslist shares it owns to craigslist.

Whether the California action is the proverbial stone in craigslist's sling that will fell the giant eBay remains to be seen.[70] As I discuss in my analysis below, the battle in Delaware has not been as one-sided a victory for the smaller contender as was the contest between the fabled Israelite and Philistine:[71] more fortunate than Goliath, eBay leaves this field with only a gash across its forehead; less fortunate than David, craigslist leaves this field with something less than total victory.

## II. ANALYSIS

 Jim and Craig owe fiduciary duties to eBay because they are directors

---

69. *See* 1 *Samuel* 17:43 (Goliath expressing annoyance when David first confronts him with staff, sling, and stone: "Am I a dog, that thou comest to me with staves?").

70. I realize, of course, that in some circles craigslist may already be enjoying a "david-vs-goliath" public relations benefit, independent of the legal merits of this case. I also realize that there is some irony in referring to

craigslist as "David" and eBay as "Goliath," given craigslist's dominance in the field of online classifieds and eBay's position as a minority stockholder here. That irony has its limits, however, as eBay clearly dwarfs craigslist by any other measure of business scale or scope.

71. *Samuel* 17:44–51 (describing David's prodigious thumping of Goliath).

and controlling stockholders of craigslist, and eBay is a minority stockholder of craigslist. All directors of Delaware corporations are fiduciaries of the corporations' stockholders.[72] Similarly, controlling stockholders are fiduciaries of their corporations' minority stockholders.[73] Even though neither Jim nor Craig individually owns a majority of craigslist's shares, the law treats them as craigslist's controlling stockholders because they form a control group, bound together by the Jim–Craig Voting Agreement, with the power to elect the majority of the craigslist board.[74]

eBay's complaint asserts that Jim and Craig breached the fiduciary duties they owed to eBay by implementing the 2008

Board Actions. eBay argues that the implementation of the 2008 Board Actions was a breach of fiduciary duty because the SPA and the Shareholders' Agreement limits the actions craigslist can take in response to eBay's Competitive Activity, and, by implementing the 2008 Board Actions, Jim and Craig used their fiduciary positions to cause craigslist to take actions beyond those permitted by the SPA and the Shareholders' Agreement.[75] eBay also asserts that by enacting the 2008 Board Actions, Jim and Craig used their fiduciary positions to secure rights and benefits for themselves that they were not able to secure when they negotiated the SPA and the Shareholders' Agreement with eBay in 2004.[76] Fundamentally these contentions

**72.** *Mills Acquisition Co. v. Macmillan, Inc.,* 559 A.2d 1261, 1280 (Del.1989).

**73.** *Ivanhoe Partners v. Newmont Mining Corp.,* 535 A.2d 1334, 1344 (Del.1987).

**74.** *Dubroff v. Wren Holdings, LLC,* 2009 WL 1478697, at *3 (Del.Ch. May 22, 2009) ("Delaware case law has recognized that a number of shareholders, each of whom individually cannot exert control over the corporation (either through majority ownership or significant voting power coupled with formidable managerial power), can collectively form a control group where those shareholders are connected in some legally significant way—e.g., by contract, common ownership, agreement, or other arrangement—to work together toward a shared goal. In that case, the control group is accorded controlling shareholder status, and, therefore, its members owe fiduciary duties to their fellow shareholders.").

**75.** For example, eBay contends that § 8.3 of the Shareholders' Agreement precluded craigslist from implementing the 2008 Board Actions because eBay's loss of consent rights, preemptive rights, and rights of first refusal were to be "the sole remedy for any action brought by [craigslist] against [eBay] . . . that may arise from or as a result of [eBay] . . . engaging in Competitive Activity. . . ." I take a moment to address eBay's argument about

§ 8.3 of the Shareholders' Agreement, even though doing so is gratuitous because, as I will explain below, this argument fundamentally asserts that Jim and Craig caused craigslist to breach the Shareholders' Agreement. eBay did not, however, make a claim for breach of contract in its complaint. Had eBay asserted a claim alleging breach of § 8.3, however, I would not have been persuaded. A plain reading of the text demonstrates that § 8.3 simply limits the remedies craigslist can obtain by filing suit (i.e., "bringing an action") against eBay based on eBay's Competitive Activity. Section 8.3 does not apply to the 2008 Board Actions because the Actions did not involve a lawsuit brought by craigslist against eBay. Moreover, nothing in § 8.3 expressly prohibits craigslist from implementing corporate governance or capital structure changes in response to eBay's Competitive Activity. Accordingly, § 8.3 of the Shareholders' Agreement did not preclude craigslist from implementing the 2008 Board Actions.

**76.** For example, eBay argues that during negotiations for the SPA and the Shareholders' Agreement, Jim and Craig were unable to get eBay to agree that Jim and Craig would both have the right to consent to additional purchases of craigslist shares by eBay. eBay asserts that Jim and Craig secured this benefit through the Rights Plan, contending that the Rights Plan effectively requires both Jim and

sound like arguments that Jim and Craig breached the SPA, the Shareholders' Agreement, or the implied covenant of good faith and fair dealing inherent in the SPA and the Shareholders' Agreement. Curiously, however, eBay has never formally alleged—in the complaint, trial arguments, or briefs—that Jim and Craig breached the SPA or the Shareholders' Agreement by implementing the 2008 Board Actions; nor has eBay formally alleged that Jim and Craig breached the implied covenant of good faith and fair dealing by implementing the 2008 Board Actions.[77] eBay's contention is that Jim and Craig breached their *fiduciary duties* by implementing the 2008 Board Actions and that the ROFR/Dilutive Issuance violates §§ 152 and 202(b) of the Delaware General Corporation Law ("DGCL"). Throughout this dispute, I have repeatedly read and listened to what look and sound like breach of contract arguments, which eBay uses not to prove Jim and Craig breached a contract, but rather to prove Jim and Craig breached their fiduciary duties. This has been an odd exercise, and I admit I am puzzled by eBay's decision not to bring a breach of contract claim or, more promising perhaps, a claim for breach of the implied covenant, considering eBay expended significant effort arguing that the 2008 Board Actions violat-

ed both the technical provisions and the spirit of the SPA and the Shareholders' Agreement. The fact remains, however, that eBay asserted neither a breach of contract claim nor a claim for breach of the implied covenant. Therefore, I make no ruling on whether Jim and Craig breached the SPA, the Shareholders' Agreement, or the implied covenant of good faith and fair dealing by implementing the 2008 Board Actions. The legal conclusions in this Opinion only relate to whether Jim and Craig breached the fiduciary duties they owe to eBay by implementing the 2008 Board Actions.[78]

Any time a stockholder challenges an action taken by the board of directors, the Court must first determine the appropriate standard of review to use in analyzing the challenged action. Identifying the appropriate standard of review ensures that the Court applies the proper level of judicial scrutiny to the board's decision-making process.[79]

Although Jim and Craig implemented all the 2008 Board Actions on the same date, I analyze each Action individually. This case does not present a situation in which I must view each Action as a unified response to a specific threat; that is, I need not apply the *Unocal Corporation v. Mesa*

---

Craig to consent before eBay can purchase additional craigslist shares, because additional purchases by eBay will trigger the rights unless both Jim and Craig, as directors, vote to make the Rights Plan inapplicable to eBay's purchases.

**77.** The complaint contains seven counts: Count I is a claim for breach of fiduciary duty related to director indemnification agreements which was dismissed, Count II is a claim for waste related to director indemnification agreements which was dismissed, Count III is a claim for breach of fiduciary duty in connection with the ROFR/Dilutive Issuance, Counts IV and V are claims that the ROFR/Dilutive Issuance violate the DGCL,

Count VI is a claim for breach of fiduciary duty in connection with the Rights Plan, and Count VII is a claim for breach of fiduciary duty in connection with the Staggered Board Amendments.

**78.** Although I am only required to determine whether Jim and Craig breached their fiduciary duties to resolve this dispute, this Opinion unavoidably engages in some contractual analysis because eBay often attempts to prove a breach of fiduciary duty by arguing that the 2008 Board Actions violated the SPA and the Shareholders' Agreement.

**79.** *MM Companies, Inc. v. Liquid Audio, Inc.,* 813 A.2d 1118, 1127 (Del.2003).

*Petroleum Company* [80] standard of review to each of the Actions or to the Actions as a whole. The Delaware Supreme Court has stated:

> In assessing a challenge to defensive actions by a target corporation's board of directors in a takeover context ... the Court of Chancery should evaluate the board's overall response, including the justification for each contested defensive measure, and the results achieved thereby. Where all of the target board's defensive actions are inextricably related, the principles of *Unocal* require that such actions be scrutinized collectively as a unitary response to the perceived threat.[81]

■ The 2008 Board Actions are not an "inextricably related" set of responses to a takeover threat. In fact, I do not view the Staggered Board Amendments, in the unique circumstances of this case, as a defensive measure at all.[82] Accordingly, I do not apply the heightened standard from *Unocal* and its progeny to the Staggered Board Amendments, and I apply a deferential business judgment standard for reasons outlined below. The Rights Plan, on the other hand, implicates *Unocal* concerns in my view because rights plans (known as "poison pills" in takeover parlance) fundamentally are defensive devices that, if used correctly, can enhance stockholder value but, if used incorrectly, can entrench management and deter value-maximizing bidders at the stockholders' expense. I therefore subject the Rights Plan to the *Unocal* standard of review. Finally, I subject the ROFR/Dilutive Issuance to entire fairness review because Jim and Craig stand on both sides of that Action in the classic sense. I begin my analysis with the Rights Plan.

## A. The Rights Plan

■ I will review Jim and Craig's adoption of the Rights Plan using the intermediate standard of enhanced scrutiny, typically referred to as the *Unocal* test. Framed generally, enhanced scrutiny "requires directors to bear the burden to show their actions were reasonable." [83] The directors must "(1) identify the proper corporate objectives served by their actions; and (2) justify their actions as reasonable in relationship to those objectives." [84]

■■ Enhanced scrutiny has been applied universally when stockholders challenge a board's use of a rights plan as a defensive device.[85] In the typical scenario, the decision to deploy a rights plan will fall within the range of reasonableness if the directors use the plan in a good faith effort to promote stockholder value. For example, the Delaware Supreme Court originally validated the use of a rights plan so that boards could protect target stockholders from two-tiered, front-end loaded, struc-

---

80. 493 A.2d 946 (Del.1985).

81. *Unitrin, Inc. v. Am. Gen. Corp.*, 651 A.2d 1361, 1386–87 (Del.1995).

82. There could well be instances where a staggered board provision is adopted as a defensive device to a takeover threat. *See* Eric S. Robinson, *Classified Boards Once Again Prove Their Value to Shareholders in Recent Takeover Battle*, THE HARVARD LAW SCHOOL FORUM ON CORPORATE GOVERNANCE AND FINANCIAL REGULATION, Aug. 20, 2007, http:// blogs.law.harvard.edu/corpgov/files/2007/10/ 20071020–staggered–boards.pdf. This case, however, is not such an instance.

83. *Mercier v. Inter–Tel (Delaware), Inc.*, 929 A.2d 786, 807 (Del.Ch.2007).

84. *Id.*

85. *See, e.g., Yucaipa Am. Alliance Fund II, L.P. v. Riggio*, 1 A.3d 310 (Del.Ch.2010); *Moran v. Household Int'l, Inc.*, 500 A.2d 1346 (Del.1985).

turally coercive offers.[86] Subsequent case law has established that a board can use the protection of a rights plan to respond to an underpriced bid, counter the tender offeror's timing and informational advantages, and force the hostile acquirer to negotiate with the board.[87] What remains fairly litigable is the degree to which a board can keep the shield of a rights plan in place under the situationally specific circumstances of a given case.[88] A board similarly can use a rights plan creatively to protect the value of a corporate asset for the benefit of its stockholders [89] or to block a creeping takeover.[90] Using a rights plan to promote stockholder value is a legitimate exercise of board authority that accords with the directors' fiduciary duties.

■■ Like any strong medicine, however, a pill can be misused. The Delaware Supreme Court understood from the outset that a rights plan can be deployed

**86.** Coercive offers of this type were frequently used in the 1980's, and the Supreme Court addressed the propriety of board defensive actions in a series of decisions, beginning with *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946, 956 (Del.1985) ("It is now well recognized that such offers are a classic coercive measure designed to stampede shareholders into tendering at the first tier, even if the price is inadequate, out of fear of what they will receive at the back end of the transaction.") (citation omitted) and then continuing with *Moran*, 500 A.2d at 1357 (upholding a rights plan that directors implemented to protect the company from future coercive acquisition techniques, including boot-strap and bust-up takeovers in the form of two-tiered offers) and *Revlon Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173 (Del. 1986) (holding that although a rights plan's usefulness was mooted by subsequent board action, the board's initial decision to adopt the rights plan was reasonable to counter a threat in the form of a hostile takeover at a price below what the board reasonably concluded was the company's intrinsic value).

**87.** *See City Capital Assocs. v. Interco Inc.*, 551 A.2d 787, 798 (Del.Ch.1988) ("If [a board's determination of price inadequacy] is made in good faith ... it alone will justify leaving a poison pill in place, even in the setting of a noncoercive offer, for a period while the board exercises its good faith business judgment to take such steps as it deems appropriate to protect and advance shareholder interests in light of the significant development that such an offer doubtless is. That action may entail negotiation on behalf of shareholders with the offeror, the institution of a *Revlon*-style auction for the Company, a recapitalization or restructuring designed as an alternative to the offer, or other action.") (ci-

tation omitted). *Cf. Paramount Commc'ns, Inc. v. Time Inc.*, 1989 WL 79880 (Del.Ch. July 14, 1989), *aff'd*, 571 A.2d 1140 (Del. 1990).

**88.** *See, e.g., Yucaipa*, 1 A.3d 310 (holding that given the specific facts of the case, the board had made a reasonable judgment that there was a threat to the corporation and had employed a rights plan that was a reasonable and proportional response to that threat); *Interco Inc.*, 551 A.2d 787 (granting an injunction requiring board of directors to redeem a rights plan, given that the noncoercive stock offer presented only a mild threat to stockholders' economic interests and, thus, did not justify use of a rights plan that would preclude the stockholders from accepting the offer).

**89.** *See, e.g., Selectica, Inc. v. Versata Enters., Inc.*, 2010 WL 703062 (Del.Ch. Feb. 26, 2010) (declaring valid a board's decision to adopt and deploy a poison pill with a low trigger of 4.99% in an effort to preserve the company's right to use its tax-advantageous net operating losses).

**90.** *See, e.g., Yucaipa*, 1 A.3d 310; *Louisiana Mun. Police Employees' Ret. Sys. v. Fertitta*, 2009 WL 2263406, at *5 (Del.Ch. July 28, 2009) (noting that although a board must have been aware of defendant's creeping takeover, the board did nothing to stop the accumulation of shares, such as reach a standstill agreement or adopt a rights plan). *Cf. Ivanhoe Partners v. Newmont Mining Corp.*, 535 A.2d 1334 (Del.1987) (holding that a comprehensive defensive scheme—consisting of a dividend, a standstill agreement, and a street sweep—met the *Unocal* test for a reasonable and proportional response to a perceived threat to the corporation).

inappropriately to benefit incumbent managers and directors at the stockholders' expense.[91] Therefore when deploying a rights plan, "directors must at minimum convince the court that they have not acted for an inequitable purpose."[92] And more than mere subjective good faith is required. Human judgment can be clouded by subtle influences like the prestige and perquisites of board membership, personal relationships with management, or animosity towards a bidder.[93] Because of the omnipresent specter that directors could use a rights plan improperly, even when acting *subjectively* in good faith, *Unocal* and its progeny require that this Court also review the use of a rights plan *objectively*. Like other defensive measures, a rights plan cannot be used preclusively or coercively; nor can its use fall outside the "range of reasonableness."[94]

This case involves a unique set of facts heretofore not seen in the context of a challenge to a rights plan. To my knowledge, no decision under Delaware law has addressed a challenge to a rights plan adopted by a privately held company with so few stockholders.[95] The ample case law

91. *See, e.g., Unocal,* 493 A.2d at 954 ("Because of the omnipresent specter that a board may be acting primarily in its own interests, rather than those of the corporation and its shareholders, there is an enhanced duty which calls for judicial examination at the threshold before the protections of the business judgment rule may be conferred."). *See also Selectica, Inc.,* 2010 WL 703062, at *12 (applying enhanced scrutiny due to the omnipresent specter discussed in *Unocal*); *Kahn on Behalf of DeKalb Genetics Corp. v. Roberts,* 679 A.2d 460, 464 (Del.1996) (acknowledging the omnipresent specter discussed in *Unocal*); *Unitrin, Inc. v. Am. Gen. Corp.,* 651 A.2d 1361, 1373 (Del.1995) (noting that the Delaware Supreme Court "has recognized that directors are often confronted with an inherent conflict of interest during contests for corporate control because of the omnipresent specter that a board may be acting primarily in its own interests, rather than those of the corporation and its shareholders.") (quotation omitted).

92. *Mercier v. Inter–Tel (Delaware), Inc.,* 929 A.2d 786, 807 (Del.Ch.2007) (citing *Unocal,* 493 A.2d at 955).

93. *See, e.g., Venhill Ltd. P'ship ex rel. Stallkamp,* 2008 WL 2270488, at *1 (Del.Ch. June 3, 2008) ("[I]t is not only greed that can inspire disloyal behavior by a business fiduciary."); *In re RJR Nabisco, Inc. S'holders Litig.,* 1989 WL 7036, at *15 (Del.Ch. Jan. 31, 1989) ("Greed is not the only human emotion that can pull one from the path of propriety; so might hatred, lust, envy, revenge, or, as is here alleged, shame or pride. Indeed any human emotion may cause a director to place his own interests, preferences or appetites before the welfare of the corporation . . . ."); *Interco Inc.,* 551 A.2d at 796 ("[H]uman nature may incline *even one acting in subjective good faith* to rationalize as right that which is merely personally beneficial.").

94. *See Unitrin, Inc.,* 651 A.2d at 1387–88 ("If a defensive measure is not draconian, however, because it is not either coercive or preclusive, the *Unocal* proportionality test requires the focus of enhanced judicial scrutiny to shift to 'the range of reasonableness' ") (citing *Paramount Commc'ns, Inc. v. QVC Network, Inc.,* 637 A.2d 34, 45–46 (Del.1994)); *see also Chesapeake Corp. v. Shore,* 771 A.2d 293, 323, 329 (Del.Ch.2000) (explaining that although the Court will "afford a reasonable degree of deference to a properly functioning board that identifies a threat and adopts proportionate defenses after a careful and good faith inquiry," "subjectively well-intentioned board action that has preclusive or coercive effects" is nonetheless subject to intermediate scrutiny by the Court); *see generally Mercier,* 929 A.2d 786.

95. Experts in this field have noted the rarity of a private company adopting a rights plan. *See, e.g.,* Lou R. Kling & Eileen T. Nugent, Negotiated Acquisitions of Companies, Subsidiaries and Divisions, § 16.06 n.1 (2010) ("In theory, there is no reason why a private company, if its shares were sufficiently widely held, could not adopt such a plan. In our experience, this rarely occurs, either because the ownership of such companies is not sufficiently dispersed to make them vulnerable to hos-

addressing rights plans almost invariably involves publicly traded corporations with a widely dispersed, potentially disempowered, and arguably vulnerable stockholder base. In cases involving rights plans to date, Delaware courts have typically and understandably approved the use of rights plans to remedy the collective action problems that stockholders face, including but not limited to the classically coercive prisoner's dilemma imposed by a two-tiered offer. At the same time, Delaware courts have guarded against the overt risk of entrenchment and the less visible, yet more pernicious risk that incumbents acting in subjective good faith might nevertheless deprive stockholders of value-maximizing opportunities.

In this unique case, I do not face those same concerns. Jim and Craig are not dispersed, disempowered, or vulnerable stockholders. They are the majority. Jim and Craig are not using the Rights Plan improperly to preclude craigslist stockholders from considering and opting for a value-maximizing transaction. As the majority, Jim and Craig can consider and opt-for a value-maximizing transaction whenever they want.

Nor are Jim and Craig using the Rights Plan to protect their board seats. Together Jim and Craig own an overwhelming majority of craigslist's voting power, and they have entered into the Jim–Craig Voting Agreement which ensures that each votes the other onto the board. If eBay were to sell its entire interest in craigslist to some third party, that third party would not be able to unseat either Jim or Craig because, like eBay, it would only own a minority interest. Neither eBay nor any third party who might purchase eBay's craigslist shares could threaten Jim or Craig with a proxy fight. Under their voting agreement, Jim cannot grant a proxy to unseat Craig, and Craig cannot grant a proxy to unseat Jim. Furthermore, as rationally self-interested actors, Jim and Craig will not give someone a proxy to unseat themselves.

These unique factors do not, however, eliminate *Unocal's* usefulness. *Unocal* has correctly been described as "the most innovative and promising" [96] case in our corporation law and one whose insights "will [ ] continue to resonate with judges." [97] The intermediate standard of review is not limited to the historic and now classic paradigm. Fiduciary duties apply regardless of whether a corporation is "registered and publicly traded, dark and delisted, or closely held." [98] It is entirely possible that the board of a closely held company such as craigslist could deploy a rights plan improperly. The *Unocal* standard of review is best equipped to address this concern.

Thus, the two main issues I confront are: First, did Jim and Craig properly and reasonably perceive a threat to craigslist's corporate policy and effectiveness? Sec-

tile takeovers or, conversely, because the shareholders do not wish to cede to their boards the ability to control such a powerful defensive weapon if an unsolicited takeover were attempted.").

96. *Interco Inc.*, 551 A.2d at 796.

97. William T. Allen, Jack B. Jacobs & Leo E. Strine, Jr., *The Great Takeover Debate: A Meditation on Bridging the Conceptual Divide*, 69 U. Chi. L.Rev. 1067, 1093 (2002) (discussing

"[t]he original insight in *Unocal* that justifies [a] more intensive form of review," and describing that insight as the consideration "that when directors and managers face displacement by an offer they did not solicit, a variety of human emotions can potentially compromise their ability to respond to that offer impartially.").

98. *Kurz v. Holbrook*, 989 A.2d 140, 183 (Del. Ch.2010), *rev'd on other grounds*, 992 A.2d 377 (Del.2010).

ond, if they did, is the Rights Plan a proportional response to that threat?

■■■ As discussed above, there are several recognized and accepted corporate purposes for adopting a rights plan. Nevertheless, there is no formal exhaustive list of valid reasons for doing so. As Vice Chancellor Noble demonstrated earlier this year, the Court of Chancery is mindful of changing conditions in the corporate world that may warrant the Court's recognition of a new, valid corporate purpose for adopting a rights plan.[99] In that spirit, I have carefully considered Jim and Craig's contentions in this case and the evidence they presented in support of those contentions. I conclude, based on all of the evidence, that Jim and Craig in fact did *not* adopt the Rights Plan in response to a reasonably perceived threat or for a proper corporate purpose.

Jim and Craig contend that they identified a threat to craigslist and its corporate policies that will materialize after they both die and their craigslist shares are distributed to their heirs. At that point, they say, "eBay's acquisition of control [via the anticipated acquisition of Jim or Craig's shares from some combination of their heirs] would fundamentally alter craigslist's values, culture and business model, including departing from [craigslist's] public-service mission in favor of

increased monetization of craigslist." [100] To prevent this unwanted potential future reality, Jim and Craig have adopted the Rights Plan *now* so that their vision of craigslist's culture can bind *future* fiduciaries and stockholders from beyond the grave. Having given new meaning to the concept of a "dead-hand pill," Jim and Craig ask this Court to validate their attempt to use a pill to shape the future of the space-time continuum.

It is true that on the unique facts of a particular case—*Paramount Communications, Inc. v. Time Inc.*[101]—this Court and the Delaware Supreme Court accepted defensive action by the directors of a Delaware corporation as a good faith effort to protect a specific corporate culture.[102] It was a muted embrace. Chancellor Allen wrote only that he was "not persuaded that there may not be instances in which the law might recognize as valid a perceived threat to a 'corporate culture' that is shown to be palpable (for lack of a better word), distinctive and advantageous." [103] This conditional, limited, and double-negative-laden comment was offered in a case that involved the journalistic independence of an iconic American institution. Even in that fact-specific context, the acceptance of the amorphous purpose of "cultural protection" as a justification for defensive action did not escape criticism.[104]

99. *See Selectica, Inc. v. Versata Enters., Inc.,* 2010 WL 703062 (Del.Ch. Feb. 26, 2010) (declaring valid a board's decision to adopt and deploy a poison pill with a low trigger of 4.99% in an effort to preserve the company's right to use its tax-advantaged net operating losses).

100. Defs.' Post–Trial Answering Br. 54.

101. 571 A.2d 1140 (Del.1990).

102. The defendants also cite *Kors v. Carey,* 158 A.2d 136 (Del.Ch.1960), a decision issued long before Mr. Lipton's invention of the pill and the Delaware Supreme Court's revolu-

tionary creation of the intermediate standard of enhanced scrutiny. I cannot regard *Kors* as persuasive authority in light of the quite different approach to the review of defensive board action that prevailed during that era (the 1950's) and the watershed era of *Unocal, Revlon,* and *Moran* (the 1980's).

103. *Paramount Commc'ns, Inc. v. Time Inc.,* 1989 WL 79880, at *4 (Del.Ch. July 14, 1989), *aff'd,* 571 A.2d 1140 (Del.1990).

104. *See* Joel E. Friedlander, *Corporation and Kulturkampf: Time Culture as Illegal Fiction,* 29 CONN. L.REV. 31, 38–40, 115 (1996); Joel E.

■ More importantly, *Time* did not hold that corporate culture, standing alone, is worthy of protection as an end in itself. Promoting, protecting, or pursuing non-stockholder considerations must lead at some point to value for stockholders.[105] When director decisions are reviewed under the business judgment rule, this Court will not question rational judgments about how promoting non-stockholder interests—be it through making a charitable contribution, paying employees higher salaries and benefits, or more general norms like promoting a particular corporate culture—ultimately promote stockholder value. Under the *Unocal* standard, however, the directors must act within the range of reasonableness.

Ultimately, defendants failed to prove that craigslist possesses a palpable, distinctive, and advantageous culture that sufficiently promotes stockholder value to support the indefinite implementation of a poison pill. Jim and Craig did not make any serious attempt to prove that the craigslist culture, which rejects any attempt to further monetize its services, translates into increased profitability for stockholders. I am sure that part of the reason craigslist is so popular is because it offers a free service that is also extremely useful. It may be that offering free classifieds is an essential component of a successful online classifieds venture. After all, by offering free classifieds, craigslist is able to attract such a large community of users that real estate brokers in New York City gladly pay fees to list apartment rentals in order to access the vast community of craigslist users. Likewise, employers in select cities happily pay fees to advertise job openings to craigslist users. Neither of these fee-generating activities would have been possible if craigslist did not provide brokers and employers access to a sufficiently large market of consumers, and brokers and employers may not have reached that market without craigslist's free classifieds.

Giving away services to attract business is a sales tactic, however, not a corporate culture. Jim, Craig, and the defense witnesses advisedly described craigslist's business using the language of "culture" because that was what carried the day in *Time*. To the extent business measures like loss-leading products, money-back coupons, or putting products on sale are cultural artifacts, they reflect the American capitalist culture, not something unique to craigslist. Having heard the evidence and judged witness credibility at trial, I find that there is nothing about craigslist's corporate culture that *Time* or *Unocal* protects. The existence of a distinctive craigslist "culture" was not proven at trial. It is a fiction, invoked almost talismanically for purposes of this trial in order to find deference under *Time's* dicta.

Friedlander, *Overturn* Time–Warner *Three Different Ways*, 33 Del. J. Corp. L. 631 (2008); Alan E. Garfield, Paramount: *The Mixed Merits of Mush*, 17 Del. J. Corp. L. 33 (1992).

105. *E.g., Revlon Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173, 183 (Del.1986) ("Although such considerations [of non-stockholder corporate constituencies and interests] may be permissible, there are fundamental limitations upon that prerogative. A board may have regard for various constituencies in discharging its responsibilities, provided there are rationally related benefits accruing to the stockholders."). *See also* Robert C. Clark, Corporate Law § 16.2 (1986) (discussing views about the corporation's proper role); Jonathan Macey, *A Close Read of an Excellent Commentary on Dodge v. Ford*, 3 Va. L. & Bus. Rev. 177, 179 (2008) (suggesting that boards can take action that may not seem to directly maximize profits, so long as there is some plausible connection to a rational business purpose that ultimately benefits stockholders in some way; the benefit to other constituencies cannot be at the stockholders' expense).

The defendants also failed to prove at trial that when adopting the Rights Plan, they concluded in good faith that there was a sufficient connection between the craigslist "culture" (however amorphous and intangible it might be) and the promotion of stockholder value. No evidence at trial suggested that Jim or Craig conducted any informed evaluation of alternative business strategies or tactics when adopting the Rights Plan. Jim and Craig simply disliked the possibility that the Grim Reaper someday will catch up with them and that a company like eBay might, in the future, purchase a controlling interest in craigslist. They considered this possible future state unpalatable, not because of how it affects the value of the entity for its stockholders, but rather because of their own personal preferences. Jim and Craig therefore failed to prove at trial that they acted in the good faith pursuit of a proper *corporate* purpose when they deployed the Rights Plan. Based on all of the evidence, I find instead that Jim and Craig resented eBay's decision to compete with craigslist and adopted the Rights Plan as a punitive response. They then cloaked this decision in the language of culture and *post mortem* corporate benefit. Although Jim and Craig (and the psychological culture they embrace) were the only known beneficiaries of the Rights Plan, such a motive is no substitute for their fiduciary duty to craigslist stockholders.

Jim and Craig did prove that they personally believe craigslist should not be about the business of stockholder wealth maximization, now or in the future. As an abstract matter, there is nothing inappropriate about an organization seeking to aid local, national, and global communities by providing a website for online classifieds that is largely devoid of monetized ele-ments. Indeed, I personally appreciate and admire Jim's and Craig's desire to be of service to communities. The corporate form in which craigslist operates, however, is not an appropriate vehicle for purely philanthropic ends, at least not when there are other stockholders interested in realizing a return on their investment. Jim and Craig opted to form craigslist, Inc. as a *for-profit Delaware corporation* and voluntarily accepted millions of dollars from eBay as part of a transaction whereby eBay became a stockholder. Having chosen a for-profit corporate form, the craigslist directors are bound by the fiduciary duties and standards that accompany that form. Those standards include acting to promote the value of the corporation for the benefit of its stockholders. The "Inc." after the company name has to mean at least that. Thus, I cannot accept as valid for the purposes of implementing the Rights Plan a corporate policy that specifically, clearly, and admittedly seeks *not* to maximize the economic value of a for-profit Delaware corporation for the benefit of its stockholders—no matter whether those stockholders are individuals of modest means [106] or a corporate titan of online commerce. If Jim and Craig were the only stockholders affected by their decisions, then there would be no one to object. eBay, however, holds a significant stake in craigslist, and Jim and Craig's actions affect others besides themselves.

Jim and Craig's defense of the Rights Plan thus fails the first prong of *Unocal* both factually and legally. I find that defendants failed to prove, as a factual matter, the existence of a distinctly protectable craigslist culture and further failed to prove, both factually and legally, that they actually decided to deploy the Rights Plan because of a craigslist culture.

---

**106.** The evidence does not suggest that Jim or Craig falls into the category of stockholders of modest means, at least according to the average person's definition of "modest."

I find, instead, that Jim and Craig acted to punish eBay for competing with craigslist. Directors of a for-profit Delaware corporation cannot deploy a rights plan to defend a business strategy that openly eschews stockholder wealth maximization—at least not consistently with the directors' fiduciary duties under Delaware law.

Up to this point, I have evaluated the Rights Plan primarily though the lens of the first prong of *Unocal.* To the extent I assume for purposes of analysis that a craigslist culture was something that Jim and Craig reasonably could seek to protect, the Rights Plan nonetheless does not fall within the range of reasonable responses. In evaluating the range of reasonableness, it is important to note that Jim and Craig actually do not seek to protect the craigslist "culture" today. They are perfectly able to ensure the continuation of craigslist's "culture" so long as they remain majority stockholders. What they instead want is to preserve craigslist's "culture" over some indefinite period that starts at the (happily) unknowable moment when their natural lives come to a close. The attenuated nature of that goal further undercuts the degree to which "culture" can provide a basis for heavy-handed defensive action.

In their fight against the imperatives of time, Jim and Craig deployed a rights plan that singles out eBay and effectively precludes eBay from selling the entirety of its shares as one complete block. Because the Rights Plan is not fully preclusive—in that eBay can sell its shares in chunks no larger than 14.99%—the plan is more appropriately evaluated against the range of reasonableness.

The avowed purpose of the Rights Plan is to protect the craigslist "culture" at some point in the future unrelated to when eBay sells some or all of its shares. As long as Jim and Craig have control, however, they can maintain the craigslist "culture" regardless of whether eBay sells some or all of its shares. The Rights Plan neither affects when eBay can sell its shares nor affects when the craigslist culture can change. It therefore does not have a reasonable connection to Jim and Craig's professed goal. Assuming Jim and Craig sought to establish a corporate *Academie Francaise* to protect the cultural integrity of craigslist's business model, the Rights Plan simply does not serve that goal. It therefore falls outside the range of reasonableness.[107] On the factual record presented at trial, therefore, the defendants also failed to meet their burden of proof under the second prong of *Unocal.*

Because defendants failed to prove that they acted to protect or defend a legitimate corporate interest and because they failed to prove that the rights plan was a reasonable response to a perceived threat to corporate policy or effectiveness, I rescind the Rights Plan in its entirety.

## B. The Staggered Board Amendments

Before determining whether I should subject the Staggered Board Amendments to business judgment review or entire fairness review, I will first explain more fully why I conclude that the Staggered Board Amendments are not subject to *Unocal* review. Unlike the Rights Plan, the Staggered Board Amendments do not function as a defensive device under the unique facts of this case. Even if craigslist did not have a staggered

---

107. *See Mentor Graphics Corp. v. Quickturn Design Sys., Inc.,* 728 A.2d 25, 50–51 (Del.Ch. 1998) (enjoining a poison pill because, although it was neither coercive nor preclusive, it fell outside the range of reasonableness and therefore failed the proportionality test), *aff'd on different grounds,* 721 A.2d 1281 (Del. 1998).

board, Jim and Craig would control a majority of the board. The Jim–Craig Voting Agreement ensures that Jim's designee and Craig's designee will always fill two of the three director positions. At best, eBay places one director on the board; at worst, eBay places no directors on the board. So long as the Jim–Craig Voting Agreement remains in effect and there are only three authorized director positions, eBay will never have an opportunity to control the board. The number of authorized director positions will not change unless Jim and Craig, as the majority of the board, vote to change the number of director positions.[108] Thus, the Staggered Board Amendments make it impossible for eBay to unilaterally place one of three directors on the board, but did not affect Jim and Craig's ability to control the board by filling two of the three director positions currently authorized by the craigslist bylaws. It would be inappropriate to apply *Unocal* to the Staggered Board Amendments because they do not implicate the concerns that drive *Unocal;* there is no "omnipresent specter" that the Staggered Board Amendments are being used for entrenchment purposes.[109] I will now analyze whether the Staggered Board Amendments should be subject to the business judgment or the entire fairness standard of review.

Under the business judgment rule, when a party challenges the decisions of a board of directors, the Court begins with the "presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."[110] The business judgment standard of review is deferential. When applying this standard, the Court "will not substitute its judgment for that of the board if the [board's] decision can be 'attributed to any rational business purpose.'"[111] Thus, the business judgment rule protects against the risk that a court might "impos[e] itself unreasonably on the business and affairs of a corporation."[112]

To avoid application of the deferential business judgment standard, the plaintiff must produce evidence that rebuts the business judgment presumption.[113] There are a number of ways the plaintiff can rebut the business judgment presumption, including by showing that the majority of directors who approved the action (1) had a personal interest in the subject matter of the action,[114] (2) were not fully informed in approving the action,[115] or (3) did not act in good faith in approving the action.[116] If the plaintiff rebuts the business judgment presumption, the Court applies the entire fairness standard of review to the challenged action and places the burden on the directors to prove that the

---

108. *See* Restated Charter, Article VIII ("The number of directors of the corporation shall be fixed, and may be increased or decreased from time to time, exclusively by resolution approved by the affirmative vote of a majority of the whole Board of Directors[.]").

109. *See Unocal Corp. v. Mesa Petroleum Co.,* 493 A.2d 946, 954 (Del.1985).

110. *Unitrin, Inc. v. Am. Gen. Corp.,* 651 A.2d 1361, 1373 (Del.1995) (quoting *Aronson v. Lewis,* 473 A.2d 805, 811 (Del.1984)).

111. *Id.* (quoting *Unocal,* 493 A.2d at 954).

112. *Cede & Co. v. Technicolor, Inc.,* 634 A.2d 345, 360 (Del.1993).

113. *Cinerama, Inc. v. Technicolor, Inc.,* 663 A.2d 1156, 1162 (Del.1995).

114. *Aronson,* 473 A.2d at 812.

115. *Citron v. Fairchild Camera & Instrument Corp.,* 569 A.2d 53, 64 (Del.1989).

116. *Id.*

action was entirely fair.[117]

eBay contends that the Staggered Board Amendments must pass muster under the entire fairness standard on two grounds: (1) Jim and Craig, as controlling stockholders and directors, were personally interested in the Staggered Board Amendments because implementing a staggered board redounded to their benefit but harmed eBay as the minority stockholder, and (2) Jim and Craig approved the Staggered Board Amendments in bad faith, with the intent to harm eBay. I will consider each argument in turn.

First, eBay contends that Jim and Craig are personally interested in the Staggered Board Amendments—even though they do not literally stand on both sides of that Action—because the Staggered Board Amendments treat eBay, the minority stockholder, differently than Jim and Craig, the majority stockholders and directors, by eliminating eBay's ability to unilaterally elect a director to the craigslist board but having no effect on Jim and Craig's abilities to elect craigslist directors. After they implemented the Staggered Board Amendments, Jim and Craig still were able to elect their director nominees to the craigslist board. In the years that the Class I and II director positions are up for election, the Jim–Craig Voting Agreement requires Jim and Craig to vote their shares together, thereby ensuring that their nominees will be elected. eBay, however, lost its ability to unilaterally elect an eBay nominee to the craigslist board.

The Staggered Board Amendments leave eBay with only the mere possibility of having an eBay nominee elected in the year the Class III director position is voted upon. In that year, eBay has no guarantee that its nominee will be elected because eBay's minority ownership interest is insufficient to unilaterally elect a director if only one director position is up for election, even under a cumulative voting regime. Thus, eBay contends, the Staggered Board Amendments affect Jim and Craig differently than they affect eBay, and this disparate treatment between fiduciaries, on the one hand, and a minority stockholder, on the other hand, requires application of the entire fairness standard of review. eBay relies on *In re John Q. Hammons Hotels, Inc. Shareholder Litigation,*[118] *Hamilton v. Nozko,*[119] and *Litle v. Waters*[120] to argue that *whenever* a board action affects directors or controlling stockholders differently than minority stockholders, entire fairness review applies.[121]

 I am not persuaded that entire fairness review applies to the Staggered Board Amendments on the ground that eBay was affected differently than Jim and Craig by the implementation of a staggered board. The cases eBay relies on do not support a rule of law that would invoke entire fairness review any time a corporate action affects directors or controlling stockholders differently than minority stockholders.[122] Entire fairness review ordinarily applies in cases where a fiduciary

---

117. *Cede & Co. v. Technicolor, Inc.,* 634 A.2d at 361. These three alternatives are not an exhaustive list of ways a plaintiff may invoke entire fairness review.

118. 2009 WL 3165613 (Del.Ch. Oct. 2, 2009).

119. 1994 WL 413299 (Del.Ch. July 27, 1994).

120. 1992 WL 25758 (Del.Ch. Feb. 11, 1992).

121. *See, e.g.,* Pl.'s Post–Trial Op. Br. 53.

122. Disparate treatment of stockholders is not a *per se* violation of Delaware law. *See Nixon v. Blackwell,* 626 A.2d 1366 (Del.1993) (concluding that defendants had established entire fairness of a policy that treated employee stockholders and non-employee stockholders differently).

either literally stands on both sides of the challenged transaction or where the fiduciary "expects to derive personal financial benefit from the [challenged] transaction in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally."[123] The three cases eBay relies on—*In re Hammons, Hamilton,* and *Litle*—involved situations where a fiduciary allegedly derived a personal financial benefit from the challenged transaction at the expense of the minority stockholders.[124] Such transactions involve classic self-dealing by a fiduciary and are subject to entire fairness review.[125] The transactions challenged in those three cases are quite dissimilar from the Staggered Board Amendments. First, Jim and Craig did not realize a financial benefit by approving the Staggered Board Amendments so there was no self-dealing on the basis of financial considerations. Second, and more importantly, Delaware law does not require that minority stockholders such as eBay have board representation. Delaware corporations do not have to adopt cumulative voting for the benefit of minority stockholders,[126] and Delaware corporations have the express power to implement staggered boards.[127] If a corporation implements a staggered board, and this renders the corporation's cumulative voting system ineffective, minority stockholders have not been deprived of anything they are entitled to under the common law or the DGCL, because minority stockholders are not entitled to a cumulative voting system in the first instance. It is true that by approving the Staggered Board Amendments, Jim and Craig implemented a corporate governance structure that had a disparate and, from eBay's point of view, unfavorable impact on eBay. This is not the sort of disparate treatment, however, that can be classified as self-dealing because the law expressly allows majority stockholders to elect the entire board. Thus, the Staggered Board Amendments cannot be subjected to entire fairness review on the grounds that eliminating eBay's ability to elect a director was a form of self-dealing.

 Of course, even where fiduciaries are legally permitted to take a particular action, the action will not be countenanced if it works an inequity.[128] But the Staggered Board Amendments do not work an inequity. eBay's ability to unilaterally elect a director to the craigslist board was solely based on a cumulative voting system combined with a non-staggered board. Before eBay engaged in Competitive Activity, eBay was able to ensure this voting system and board structure remained in place because it had the contractual right under § 4.6(a)(iii) of the Shareholders' Agreement to consent to any charter amendment that would "adversely affect[ ] [eBay]." This consent right, however, was not indefeasible. Section 8.3 of the Shareholders' Agreement provides that "all of the *rights* and obligations of [eBay] set forth in Section[ ] . . .

---

123. *Litle,* 1992 WL 25758, at *4 (citing *Aronson v. Lewis,* 473 A.2d 805, 812 (Del.1984)).

124. *See In re John Q. Hammons Hotels, Inc.,* 2009 WL 3165613, at *18; *Hamilton,* 1994 WL 413299, at *7; *Litle,* 1992 WL 25758, at *4.

125. In *In re John Q. Hammons Hotels, Inc.,* the Court held that certain procedural protections could have been implemented *ab initio*

that would have neutralized the threat of self-dealing by the fiduciary and rendered the transaction subject to business judgment review. 2009 WL 3165613, at *12.

126. *See* 8 *Del. C.* § 214.

127. 8 *Del. C.* § 141(d).

128. *Schnell v. Chris–Craft Indus., Inc.,* 285 A.2d 437, 439 (Del.1971).

4.6 ... shall terminate" if eBay engages in Competitive Activity. Thus, eBay lost its consent rights over charter amendments by engaging in Competitive Activity. Throughout this dispute, eBay has protested that the 2008 Board Actions, including the Staggered Board Amendments, secured for Jim and Craig benefits that they were not able to obtain when negotiating the Shareholders' Agreement.[129] The right to amend the craigslist charter, however, without eBay's consent if eBay chose to compete with craigslist *was* a benefit Jim and Craig negotiated for *and* secured in the Shareholders' Agreement. Section 8.3 plainly articulates that benefit. Thus, the Staggered Board Amendments cannot be inequitable because they were exactly the sort of consequence eBay accepted would occur if eBay decided to compete with craigslist.[130]

By challenging the Staggered Board Amendments in this litigation, *eBay*, not Jim and Craig, seeks to obtain a benefit it was not able to obtain under the Shareholders' Agreement. In trying to undo the staggered board, and thereby protect its mathematical ability to fill a board seat, eBay is doing exactly what it accuses Jim and Craig of doing. eBay negotiated for and secured a fettered right to engage in Competitive Activity; the "fetter" being that eBay would lose its minority investor consent rights, including its right to block charter amendments, if eBay decided to compete with craigslist in online job postings in the United States. eBay engaged in Competitive Activity by launching Kijiji in the United States. eBay then chose not to cease its Competitive Activity (by either shutting down Kijiji or removing Kijiji's job listings) within the ninety-day cure period provided by § 8.3(e) after craigslist

---

129. *See, e.g.*, Pl.'s Post–Trial Opening Br. 1 ("The purpose of [the 2008 Board Actions] was (and is) to secure for [Jim and Craig] benefits they did not secure in 2004, when eBay negotiated the terms of its investment in craigslist.").

130. eBay argues that it negotiated for and secured the right to unilaterally elect a director to the craigslist board, even if eBay engaged in Competitive Activity, through § 6.18 of the SPA. The SPA required eBay to support craigslist's change in corporate domicile from California to Delaware in 2004 provided "that such [such] reincorporation shall not result in a material change in [eBay's] rights as a shareholder of [craigslist]." eBay contends that § 6.18 was intended to forever secure for eBay the rights of a stockholder in a non-listed California corporation. Because California law requires non-listed corporations to adopt cumulative voting and precludes staggered boards, eBay contends that the Staggered Board Amendments materially changed eBay's stockholder rights in violation of § 6.18. I am not persuaded by this argument. Section 6.18 confirmed the parties' intent to reincorporate craigslist in Delaware and contains a covenant, subject to a proviso, for eBay to consent to the reincorporation. The proviso would have allowed eBay to with-

hold its consent to reincorporation if the *reincorporation* were to materially change eBay's rights as a craigslist stockholder. eBay agreed with the terms of reincorporation in a signed written consent. DX–758 (written stockholders' consent approving merger of 1010 Cole Street into craigslist, signed on eBay's behalf by Brian Levey (Oct. 18, 2004)). Once craigslist reincorporated in Delaware, the proviso and covenant in § 6.18 were both satisfied and had no further application. From that point forward, eBay's stockholder rights were governed by Delaware law, not California law. Nothing in § 6.18 suggests that the parties intended for eBay to forever have the rights of a minority stockholder of a California corporation. Rights in contravention of the default rules of the DGCL must be clearly, unambiguously, and affirmatively expressed. *See, e.g., Centaur Partners, IV v. Nat'l Intergroup, Inc.*, 582 A.2d 923, 926–27 (Del.1990) ("In order to abrogate the [default DGCL rule] of plurality control, charter and by-law provisions purporting to have that effect must be clear and unambiguous"). Section 6.18 does not clearly express that eBay was *forever* entitled to cumulative voting and a non-staggered board.

sent the Notice of Competitive Activity. The negotiated consequence of these decisions, as expressly provided for in the Shareholders' Agreement, is that eBay lost the ability to block charter amendments such as the Staggered Board Amendments. eBay now asks this Court to undo the Staggered Board Amendments even though they were expressly permitted by the Shareholders' Agreement. This strikes me as eBay's attempt to obtain a permanent board seat through litigation, when it could not obtain a permanent board seat through arms-length negotiations with Jim and Craig. I decline to facilitate eBay's attempt.

■ eBay also argues that entire fairness review should apply to the Staggered Board Amendments because Jim and Craig implemented the Staggered Board Amendments in bad faith, intending to harm eBay. Under Delaware law, when a plaintiff demonstrates the directors made a challenged decision in bad faith, the plaintiff rebuts the business judgment rule presumption, and the burden shifts to the directors to prove that the decision was entirely fair to the corporation and its stockholders.[131] I find that eBay has failed to prove that Jim and Craig approved the Staggered Board Amendments in bad faith. Rather, as I will describe more fully below, the evidence at trial proves that Jim and Craig approved the Staggered Board Amendments in good faith to prevent eBay, a business competitor, from having access to confidential craigslist board discussions.

■ Because eBay failed to rebut the business judgment presumption in its challenge to the Staggered Board Amend-

ments, I review the Staggered Board Amendments under the business judgment standard of review. When the business judgment rule applies, the board's business decisions "will not be disturbed if they can be attributed to any rational business purpose. A court under such circumstances will not substitute its own notions of what is or is not sound business judgment" for the board's notions.[132] Accordingly, I will analyze the Staggered Board Amendments to see if they further any rational business purpose.

Throughout this dispute, Jim and Craig have argued that they designed the Staggered Board Amendments to keep eBay, a business competitor, from unilaterally being able to place a director on craigslist's board. Jim and Craig assert that competitively sensitive information is discussed in board meetings, and, even though craigslist does not typically concern itself with beating the competition, this competitively sensitive information could nevertheless be used by eBay to harm craigslist. Jim expressed this sentiment in his "Our Thoughts" email to Whitman shortly after eBay launched Kijiji. Moreover, eBay's own counsel represented to the NYAG that one reason the Shareholders' Agreement terminated eBay's consent rights if eBay engaged in Competitive Activity— including eBay's right to consent to an action like the Staggered Board Amendments—was to protect craigslist's "competitively sensitive information and its business in the event eBay becomes a competitor."[133] Preventing a competitor that is also a minority stockholder from unilaterally placing a director on the board so

---

131. *In re The Walt Disney Co. Derivative Litig.,* 906 A.2d 27, 52 (Del.2006).

132. *Sinclair Oil Corp. v. Levien,* 280 A.2d 717, 720 (Del.1971).

133. DX–371 (letter from eBay's outside counsel to the NYAG (Apr. 27, 2005)).

that confidential corporate information will not be freely shared with that competitor is a legitimate and rational business purpose.[134] It was rational for Jim and Craig to want to ensure that they could trust any director nominated by eBay not to use his or her board seat to access confidential information and then surreptitiously pass it on to eBay. Implementing a staggered board was one way to accomplish this. It does not matter that there were (and are) other alternatives available to Jim and Craig because the Staggered Board Amendments were sufficiently rational to satisfy business judgment review.[135] Accordingly, I conclude that Jim and Craig did not breach their fiduciary duties by approving the Staggered Board Amendments, and I decline eBay's request that I rescind the Staggered Board Amendments.

## C. The ROFR/Dilutive Issuance

The business judgment rule's protections only apply to transactions in which a majority of directors are disinterested and independent.[136] A director is "interested" if he or she stands on both sides of a transaction or expects to derive a material personal financial benefit from the transaction that does not devolve on all stockholders generally.[137] When the business judgment rule's protections do not apply, the burden is placed on the defendant directors to prove the challenged transaction is entirely fair.[138] "When directors of a Delaware corporation are on both sides of a transaction, they are required to demonstrate their utmost good faith and the most scrupulous inherent fairness of the [transaction]."[139] If directors structure a transaction that is unfair, they breach their duty of loyalty, and

134. Evidence presented in this case suggests that eBay liberally passed nonpublic craigslist information around within eBay's departments. Some of this nonpublic information was information eBay obtained at craigslist board meetings (e.g., craigslist's 2007 budget). It even appears that eBay used some of craigslist's nonpublic information to develop and launch Kijiji. Moreover, by the time Jim and Craig implemented the Staggered Board Amendments they were aware that Google AdWords were misdirecting internet users searching for "craigslist" to Kijiji. Jim and Craig had reason to suspect eBay was behind the misdirection, particularly because no one at eBay responded to Jim's accusation that eBay was misusing the AdWords. It was reasonable for Jim and Craig to further suspect that if eBay was willing to misuse AdWords to advantage Kijiji at craigslist's expense, eBay would also be willing to use, for its own advantage, nonpublic craigslist information obtained in craigslist board meetings. I discuss the evidence of eBay's alleged misuse of craigslist's nonpublic information simply to better illustrate why it would be rational for a corporate board to wish to limit competitor access to nonpublic information. Jim and Craig's suspicion that eBay was misusing information is not a basis for my opinion regarding the propriety of the staggered board;

Jim and Craig would have acted rationally even if they did not already suspect eBay of malfeasance when they staggered the board. Whether there has been actual malfeasance or not, a rational business purpose is served by limiting a competitor's access to nonpublic information.

135. *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del.1993) ("[T]he business judgment rule ... protect[s] corporate officers and directors and the decisions they make, and our courts will not second-guess these business judgments.").

136. *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984); *Orman v. Cullman*, 794 A.2d 5, 22 (Del.Ch.2002).

137. *Cede & Co. v. Technicolor, Inc.*, 634 A.2d at 363 (holding that an individual director is "interested" in a transaction only where the director's interest is material); *Orman*, 794 A.2d at 23.

138. *Mills Acquisition Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1279 (Del.1989).

139. *Weinberger v. UOP, Inc.*, 457 A.2d 701, 710 (Del.1983).

the Court may provide equitable relief to remedy the injury.[140]

■ To prove a transaction was entirely fair, directors must demonstrate that the transaction was (1) effectuated at a fair price and (2) the product of fair dealing.[141] The fair price element relates to the economics of the transaction; it focuses on whether the transaction was economically fair to the plaintiff.[142] The analysis of price can draw on any valuation methods or techniques generally accepted in the financial community.[143] Fair dealing focuses on the conduct of the fiduciaries involved in the transaction. In analyzing fair dealing the Court may inquire into how the transaction was timed, initiated, negotiated, and structured, as well as how approvals of the directors and stockholders were obtained.[144] The entire fairness test is not bifurcated; the Court must consider allegations of unfair dealing and unfair price.[145] Price, however, is the paramount consideration because procedural aspects of the deal are circumstantial evidence of whether the price is fair.[146]

■ I conclude that the ROFR/Dilutive Issuance is subject to entire fairness review. Jim and Craig stood on both sides of that Action. The parties to the right of first refusal agreement underlying the ROFR/Dilutive Issuance are craigslist on the one side and Jim and Craig on the other. Jim and Craig approved the ROFR/Dilutive Issuance in their capacity as craigslist directors, and Jim, in his capacity as CEO, signed the right of first refusal agreement for craigslist. Jim and Craig then each counter-signed the right of first refusal agreement in their individual capacities as stockholders. The consideration in the right of first refusal agreement flows from craigslist to Jim and Craig (craigslist issuing shares to Jim and Craig) and vice-versa (Jim and Craig granting a right of first refusal to craigslist). In transactions such as this, where fiduciaries deal directly with the corporation, entire fairness is ordinarily the applicable standard of review.[147]

---

140. See Mills Acquisition Co., 559 A.2d at 1264–65 (reversing the Court of Chancery's decision not to enjoin an asset option agreement that the board entered into in breach of its duties of loyalty and care).

141. Weinberger, 457 A.2d at 711.

142. Id.

143. Rosenblatt v. Getty Oil Co., 493 A.2d 929, 940 (Del.1985).

144. Weinberger, 457 A.2d at 711.

145. Id.

146. Cinerama, Inc. v. Technicolor, Inc., 663 A.2d 1156, 1172 (Del.1995) ("[A]rm's-length negotiation provides strong evidence that the transaction meets the test of fairness.") (internal quotations omitted); Monroe County Employees' Ret. Sys. v. Carlson, 2010 WL 2376890, at *2 (Del.Ch. June 7, 2010) (granting a motion to dismiss on the basis that, regardless of allegations relating to unfair dealing, there were "no factual allegations geared towards proving that the ... transactions were executed at an unfair price.").

147. But see 8 Del. C. § 144 (providing for three routes by which an interested director or officer can prevent invalidation of an agreement solely on the basis of his or her interest and involvement in the agreement); Gantler v. Stephens, 965 A.2d 695, 713 (Del. 2009) ("[R]estor[ing] coherence and clarity" to Delaware's common law doctrine of shareholder ratification by limiting the doctrine to "circumstances where a fully informed shareholder vote approves director action that does not legally require shareholder approval in order to become legally effective."); In re Wheelabrator Techs., Inc. S'holders Litig., 663 A.2d 1194, 1203 (Del.Ch.1995) ("Approval by fully informed, disinterested shareholders pursuant to § 144(a)(2) invokes 'the business judgment rule and limits judicial review to issues of gift or waste with the burden of proof upon the party attacking the transaction.'") (quoting Marciano v. Nakash, 535

Under the terms of the ROFR/Dilutive Issuance, Jim and Craig received an additional share of craigslist stock for every five shares over which they granted craigslist a right of first refusal. Jim and Craig likely had the contractual ability to implement the ROFR/Dilutive Issuance. The Shareholders' Agreement provided that eBay would lose certain consent rights if it chose to engage in Competitive Activity.[148] Among the rights eBay lost were the right to consent to (1) an increase in the authorized number of craigslist shares,[149] (2) agreements between craigslist and its officers providing for the issuance of stock,[150] and (3) preemptive rights to purchase newly issued craigslist shares.[151] Each of these measures was necessary to carry out the ROFR/Dilutive Issuance. In addition, eBay lost any contractual right to receive notice that the board was deliberating about the right of first refusal agreement. After launching Kijiji, eBay unsuccessfully tried to renegotiate the terms of the Shareholders' Agreement. One of the rights eBay sought (but failed) to obtain via renegotiation was the right to fifteen days advance notice before craigslist undertook any actions to which eBay previously had a right to consent. Based on the foregoing considerations, Jim and Craig probably did not violate a technical provision of the Shareholders' Agreement when they approved the ROFR/Dilutive Issuance.[152]

■ But the question before me is whether Jim and Craig breached their fiduciary duty of loyalty by approving the ROFR/Dilutive Issuance. Even if eBay lost its contractual ability to prevent the ROFR/Dilutive Issuance, eBay was entitled to the fiduciary duties Jim and Craig owed it as a minority stockholder. As fiduciaries, Jim and Craig were bound not to approve an interested transaction unless that transaction was entirely fair to craigslist and to eBay.

To determine whether the ROFR/Dilutive Issuance was entirely fair, I will first analyze whether that Action was effectuated at a fair price. The "price" of receiving an additional craigslist share under the ROFR/Dilutive Issuance was the granting of a right of first refusal over five shares. This same deal (a 5:1 ratio) was offered to each craigslist stockholder. Jim and Craig argue that the ROFR/Dilutive Issuance

A.2d 400, 405 n. 3 (Del.1987)). There also is a burden-shifting mechanism, rather than standard-shifting mechanism, which applies to transactions between a corporation and its controlling stockholder—as compared to those between a corporation and its directors or officers. *See id.* (citing cases that hold when minority stockholders ratify such a transaction, "the standard of review remains entire fairness, but the burden of demonstrating that the [transaction] was unfair shifts to the plaintiff") (citations omitted). However, neither mechanism applies here. Jim and Craig are not disinterested stockholders (meaning they cannot ratify their own decision as directors and shift the standard from entire fairness to business judgment), and eBay has not ratified a transaction as craigslist's minority stockholder (meaning there is no burden shift; indeed, eBay itself is the plaintiff). Thus, the appropriate standard of review is entire fairness, and it is Jim and Craig's burden to prove that the ROFR/Dilutive Issuance was entirely fair.

148. Shareholders' Agreement § 8.3.

149. *Id.* § 4.6(a)(i).

150. *Id.* § 4.6(a)(v).

151. *Id.* § 5.1.

152. The parties did not argue and I, therefore, need not decide whether the ROFR/Dilutive Issuance (which is governed by Delaware law) created a personal property interest, not held in trust, that might not vest within twenty-one years of a life in being at the time the interest was created, in violation of the rule against perpetuities. *See Stuart Kingston, Inc. v. Robinson,* 596 A.2d 1378, 1383 (Del.1991).

was fair to craigslist stockholders because all stockholders were offered the same deal. Superficially, this appears to be true. Deeper reflection, however, reveals that it actually costs eBay more to grant a right of first refusal over five of its craigslist shares than it costs Jim or Craig to do the same. When eBay engaged in Competitive Activity by launching Kijiji, Jim and Craig had to decide whether to issue a Notice of Competitive Activity. If they chose to do so and if eBay failed to cure within ninety days, eBay would lose its contractual consent rights. But there was an upside for eBay if it failed to cure: the rights of first refusal Jim and Craig held over eBay's craigslist shares under § 7.2 of the Shareholders' Agreement would terminate, and eBay's shares would become freely transferable.[153] The rights of first refusal Jim and Craig held over each other's shares under § 7.2 of the Shareholders' Agreement, however, would remain intact. eBay failed to cure within ninety days after receiving the Notice of Competitive Activity, and the craigslist shares it owns became freely transferable. Jim and Craig's craigslist shares remained encumbered. Thus, the price Jim and Craig had to pay for a new share under the ROFR/Dilutive Issuance was their granting a right of refusal to craigslist on five already-encumbered shares. The price eBay had to pay for a new share under the ROFR/Dilutive Issuance was its granting a right of first refusal to craigslist on five freely transferable shares. Although each craigslist stockholder had to grant a right of first refusal over the same number of shares to obtain a newly issued share, eBay had to surrender full transferability of its shares to craigslist, but Jim and Craig only had to substitute craigslist for themselves as the party holding a right of first refusal on their shares. Thus, the

price of the ROFR/Dilutive Issuance is not fair because it requires eBay, the minority stockholder, to give up more value per share than either Jim or Craig, the majority stockholders and directors. This disproportionate "price" is sufficient, standing alone, to render the ROFR/Dilutive Issuance void.

There is at least one other reason that the ROFR/Dilutive Issuance does not satisfy the fair price element of entire fairness. The ROFR/Dilutive Issuance put eBay in a position where it had to make one of two choices, and either choice would harm eBay economically while benefitting Jim and Craig. When Jim and Craig informed eBay of the ROFR/Dilutive Issuance, they told eBay that it had three years to decide whether to execute a joinder to the right of first refusal agreement. One of eBay's choices was to refrain from joining the right of first refusal agreement, thereby keeping its craigslist shares freely transferable. If eBay did this, however, its ownership interest in craigslist would be diluted from 28.4% to 24.9%. eBay's other choice was to join the right of first refusal agreement and receive a new craigslist share for every five shares it subjected to craigslist's right of first refusal. This would have allowed eBay to maintain its 28.4% ownership interest, but at the cost of encumbering its freely transferable craigslist shares.

Either of these two choices would deprive eBay of economic value while simultaneously benefitting Jim and Craig. The detrimental economic effects of the first choice are easiest to explain, so I will begin there. By choosing not to join the right of first refusal agreement, eBay's ownership interest was diluted from 28.4% to 24.9%. Jim and Craig's ownership interests were concomitantly increased from 29% to

153. Shareholders' Agreement § 8.3.

30.4% and 42.6% to 44.7%, respectively. The economic effect of this choice was to transfer wealth from eBay to Jim and Craig by virtue of increasing Jim and Craig's ownership of craigslist at eBay's expense.

The second choice would also harm eBay economically. By encumbering its freely tradable craigslist shares with a right of first refusal, eBay would immediately suffer an illiquidity discount. The right of first refusal is in craigslist's favor, and craigslist is controlled by Jim and Craig. The expected value to third party bidders of eBay's ownership stake in craigslist would decrease because bidders would be aware that Jim and Craig have superior "inside" knowledge of craigslist's operations [154] and are likely to place idiosyncratic value on craigslist's shares.[155] Therefore, third-party bidders would be less willing to incur the transaction costs associated with bidding for craigslist shares (including due diligence costs) if Jim and Craig could simply cause craigslist to match their offer. Third-party bidders would also be

dissuaded from bidding because, even if they outbid craigslist, craigslist would retain its right of first refusal over the shares in the hands of the third party.[156] Most, if not all, bidders would not engage in a bidding war with craigslist for eBay's craigslist shares knowing that craigslist would continue to have a right of first refusal over the shares even if the bidder won the bidding war. It is the rare bidder who would engage in a bidding war for perpetually encumbered shares.

It is not immediately clear from the evidence offered at trial whether a wealth transfer from eBay to Jim and Craig would occur if eBay joined the right of first refusal agreement.[157] It is certain, however, that Jim and Craig would benefit if eBay decided to grant craigslist a right of first refusal. I find, as a matter of fact, that Jim and Craig implemented the ROFR/Dilutive Issuance because they wanted to control whom eBay sold its craigslist shares to.[158] Jim and Craig knew that eBay's shares had become free-

154. *See* D.I. Walker, *Rethinking Rights of First Refusal*, 5 STAN. J.L. BUS. & FIN. 1, 18 (1999) ("The existence of an insider with an informational advantage affects the outsider's expected return and willingness to enter the bidding. If the better informed insider knows that the true property value is higher than the outsider believes, the insider will tend to buy. In the reverse situation, the insider will refrain. The net result should be that the informationally disadvantaged outsider tends to succeed when true value is low and to fail when true value is high.").

155. *Id.* at 17 ("The uncertainty created by the specter of potential insider idiosyncratic value reduces the outsider's expected payoff and generally lowers an outsider's interest. Intuition suggests that the potential for idiosyncratic value correlates roughly with uniqueness. *Close corporation shares are quite unique and have a high potential for insider idiosyncratic value.* Commercial property tends to be less unique and generally carries less idiosyncratic value.") (emphasis added).

156. Right of First Refusal Agreement § 3.1(a) ("[E]ach Stockholder agrees not to offer to sell all or any portion of such Stockholder's Equity Securities, unless: . . . (ii) the terms of such transfer require the proposed third-party transferee (the "Proposed Transferee") to enter into a Joinder Agreement and to acknowledge that any Offered Shares purchased by the Proposed Transferee shall continue to be subject to the rights of the Company pursuant to this Agreement.").

157. The illiquidity discount on eBay's shares may simply have resulted in a deadweight loss to eBay.

158. This factual determination is based primarily on my evaluation of Jim and Craig's trial testimony. It is also based on an extensive review of the trial record, including relevant exhibits and deposition transcripts.

ly transferable. This caused Jim and Craig to be concerned that another "Knowlton problem" was on the horizon; that is, they feared that eBay would sell its shares to a stockholder who did not fit with the craigslist culture. If Jim and Craig could coax eBay into giving craigslist a right of first refusal, then Jim and Craig could vote as directors to preempt eBay's sale to any unsuitable purchaser by simply having craigslist purchase eBay's shares. I find, as a matter of fact, that Jim and Craig desired a right of first refusal in craigslist's favor to protect their personal, sentimental interests in controlling the culture of craigslist, including the composition of its stockholders. Controlling the composition of stockholders or the respective ownership stakes of stockholders through a right of first refusal in the corporation's favor may be permitted, provided the right of first refusal bears some reasonably necessary relation to the corporation's best interests.[159] Put another way, the right of first refusal must advance a valid corporate purpose. Moreover, when directors vote to issue new shares to themselves in exchange for giving the corporation a right of first refusal, and thus stand on both sides of the transaction, the right of first refusal arrangement must be entirely fair to the corporation and to its stockholders. The ROFR/Dilutive Issuance is invalid under Delaware law because Jim and Craig have sought to control craigslist's stockholder composition for their personal and sentimental benefit at eBay's expense.[160] Thus, it fails the price

element of the entire fairness test and does not advance a proper corporate purpose.

Jim and Craig breached their fiduciary duty of loyalty by using their power as directors and controlling stockholders to implement an interested transaction that was not entirely fair to eBay, the minority stockholder. All parties agree that the most appropriate remedy for a breach of fiduciary duty in this case is rescission.[161] I concur with that assessment. Accordingly, I rescind the ROFR/Dilutive Issuance.

### D. The DGCL

eBay contends in Counts IV and V of the complaint that the ROFR/Dilutive Issuance violates 8 *Del. C.* §§ 152 and 202(b). Having concluded that the ROFR/Dilutive Issuance must be rescinded because it was not entirely fair to eBay, I need not address whether the ROFR/Dilutive Issuance violated the DGCL.

### E. Attorneys' Fees

eBay asks the Court to order Jim and Craig to reimburse craigslist for all of the legal fees incurred in this action and for the legal fees relating to the 2008 Board Actions. eBay also asks the Court to award eBay the legal fees it has incurred in this action. I decline to order any shifting of fees.

 eBay is not entitled to fees under § 9.8 of the Shareholders' Agreement[162] because eBay did not bring a

---

159. 8 *Del. C.* § 202(c)(1); *Grynberg v. Burke,* 378 A.2d 139, 142–43 (Del.Ch.1977).

160. eBay alleges that the ROFR/Dilutive Issuance was also the product of unfair dealing. I need not explore those allegations because I have concluded that the ROFR/Dilutive Issuance does not satisfy the fair price element of the entire fairness test.

161. *See* Pl.'s Post–Trial Opening Br. 86 n.60; Defs.' Post–Trial Answering Br. 79 n.69.

162. Section 9.8 provides: "In the event that any suit or action is instituted under or in relation to this Agreement, including, without limitation, to enforce any provision in this Agreement, the prevailing party in such dispute shall be entitled to recover from the losing party all fees, costs and expenses of

claim for breach of the Shareholders' Agreement or for breach of the implied covenant of good faith and fair dealing inherent in the Shareholders' Agreement. More importantly, however, the equities in this case do not mandate a shifting of attorneys' fees. Under Delaware law, parties are ordinarily responsible for paying their own attorneys' fees.[163] Equity may make an exception and shift fees to a party that has acted in bad faith in connection with the prosecution or defense of the litigation.[164] Fees may also be shifted to a losing party whose pre-litigation conduct was undertaken in bad faith and "was so egregious as to justify an award of attorneys' fees as an element of damages."[165] The Court typically will not find a litigant acted in bad faith for purposes of shifting attorneys' fees unless the litigant's conduct rose to the level of "glaring egregiousness."[166] "[M]erely being adjudicated a wrongdoer under our corporate law is not enough to justify fee shifting."[167]

 Neither Jim nor Craig engaged in behavior that could be characterized as bad faith for purposes of fee shifting. Their conduct during litigation was typical of litigants before this Court; they vigor-

ously defended their legal position without making frivolous arguments. Moreover, the 2008 Board Actions cannot be described as "glaring[ly] egregious" pre-litigation conduct. As should be evident by this point in the narrative, this is a unique case with distinct facts and difficult legal issues. I find, as a matter of fact, after evaluating the credibility and demeanor of Jim and Craig, that both men subjectively believed the 2008 Board Actions, despite their uniqueness, were legally permissible under Delaware law.[168] Their judgment was wrong, in my view, with respect to the Rights Plan and the ROFR/Dilutive Issuance. But that does not mean that Jim and Craig implemented the Rights Plan and the ROFR/Dilutive Issuance in bad faith. Neither Jim nor Craig acted with the sort of vexatious, wanton, or frivolous conduct consistent with bad faith.[169] Rather, they deliberated with counsel over a period of six months regarding the 2008 Board Actions, considered the possibility of a legal challenge to the Actions, and decided to move forward after concluding, albeit incorrectly, that the Actions were consistent with law.

 eBay also argues that it should be awarded fees because its lawsuit caused

---

enforcing any right of such prevailing party under or with respect to this Agreement, including, without limitation such reasonable fees and expenses of attorneys and accountants, which shall include, without limitation, all fees, costs and expenses of appeals."

**163.** *Dover Historical Soc., Inc. v. City of Dover Planning Comm'n,* 902 A.2d 1084, 1090 (Del. 2006).

**164.** *Mainiero v. Tanter,* 2003 WL 21003260, at *2 (Del.Ch. Apr. 25, 2003).

**165.** *Reagan v. Randell,* 2002 WL 1402233, at *3 (Del.Ch. June 21, 2002).

**166.** *Kaung v. Cole Nat'l Corp.,* 2004 WL 1921249, at *6 (Del.Ch. Aug. 27, 2004), *aff'd in part, rev'd in part,* 884 A.2d 500 (Del.2005).

**167.** *VGS, Inc. v. Castiel,* 2001 WL 1154430, at *2 (Del.Ch. Sept. 25, 2001).

**168.** *In re Sunbelt Beverage Corp. S'holder Litig.,* 2010 WL 26539, at *15 (Del.Ch. Jan. 5, 2010) (holding that fee shifting was inappropriate where there was a legal issue in the case upon which the parties reasonably could differ).

**169.** *See, e.g., Arbitrium (Cayman Islands) Handels AG v. Johnston,* 705 A.2d 225 (Del. Ch.1997) (finding that defendants acted in bad faith by, *inter alia,* opposing the action despite their knowledge that plaintiff's claim to majority stockholder status was valid, altering testimony, changing positions repeatedly, and falsifying evidence at trial), *aff'd,* 720 A.2d 542 (Del.1998).

Jim and Craig to sign affidavits that they would not execute the director indemnification agreements that eBay challenged in Counts I and II of the complaint. The corporate-benefit exception applies only if the fee applicant demonstrates that "(1) the suit was meritorious when filed; (2) the action producing benefit to the corporation was taken by the defendants before a judicial resolution was achieved; and (3) the resulting corporate benefit was causally related to the lawsuit."[170] Counts I and II were dismissed because "neither claim . . . [was] ripe for judicial review."[171] The director indemnification agreements had not been executed when eBay filed the complaint so there was "no contract or transaction for me to examine under [the] self-dealing or waste claims" in Counts I and II.[172] Therefore, Counts I and II were not meritorious when filed,[173] and an award of fees for those claims "would not be appropriate."[174]

## III. CONCLUSION

Based on the foregoing findings of fact and conclusions of law, I rescind the Rights Plan and the ROFR/Dilutive Issuance because Jim and Craig breached their fiduciary duties when they implemented those Actions. I do not rescind the Staggered Board Amendments because Jim and Craig did not breach their fiduciary duties when they implemented that Action. Further, I decline to order Jim and Craig to reimburse craigslist or eBay for attorneys' fees.

---

An Order has been entered consistent with this Opinion.

---

170. *Belanger v. Fab Indus., Inc.*, 2004 WL 3030517, at *1 (Del.Ch. Dec. 29, 2004) (internal quotations omitted).

171. *eBay Domestic Holdings, Inc. v. Newmark*, 2009 WL 3205674, at *2 (Del.Ch. Oct. 2, 2009).

172. *Id.*

173. *Belanger*, 2004 WL 3030517, at *2 ("Because Count I was premature and not ripe, Count I was not meritorious when filed.").

